Pamela D. Eisenlohr
2 Winchester Avenue
Winsted, CT  06098
Tel: 860-208-8523
Email: sezco@aol.com

FILED

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

2017 DEC 29  A 11: 58

'S DISTRICT COURT

CASE NO. _3:17-CV-2174 SRU_

CIVIL RIGHTS ACTION

**PAMELA DUDGEON EISENLOHR**

**S.D.E., minor**

**Brought by next friend and parent,**

**Pamela Dudgeon Eisenlohr**

**and those similarly situated**

**PLAINTIFFS**

**V**

**The State of Connecticut
The State of Connecticut Judicial Branch
The State of Connecticut Attorney General
Connecticut Office of the State's Attorney**

**The State of Connecticut Department of**

**Children and Families**

**State of Connecticut Department of Advocacy**

**And Protection**

**The State of Connecticut Bar Grievance
Counsel**
**The State of Connecticut Judicial Review**

**Counsel**

**State of Connecticut Office of the Child**

**Advocate**

THE AMERICANS WITH DISABILITIES AS
AMENDED ACT SECTION 504 OF THE
REHABILITATION ACT OF 1973

FEDERAL QUESTIONS
EXTRAORDINARY JURISDICTION
DIVERSITY 42 U.S. CODE § 12101

FILED IN ASSOCIATION WITH CASES  IN
FEDERAL DISTRICT COURTS:

DISTRICT OF NEW JERSEY KARIN WOLF ET AL V
STATE OF NEW JERSEY ET AL 2:2017-CV-02072

WESTERN DISTRICT OF OKLAHOMA COURT LISA
KNIGHT ET AL V THE STATE OF OKLAHOMA ET
AL 17 CV-1250 (VML) (GP)

NORTHERN DISTRICT OF CALIFORNIA MELISSA
BARNETT ET AL V THE STATE OF CALIFORNIA ET
AL 17-CV-05514 (SI)

NORTHERN DISTRICT OF CALIFORNIA FLORENCE
BOYER ET AL V THE STATE OF CALIFORNIA ET
AL 17-CV- 06063 (YGR)

DISTRICT OF OREGON CORAL THEILL ET AL V
THE STATE OF OREGON ET AL 3:17-CV-01722 (SFB)

DISTRICT OF OREGON DAVI SANCHEZ ET AL V
THE STATE OF WASHINGTON ET AL 3:17-CV-01669
(SI)

DISTRICT OF OREGON DONJA BUNNEL V THE
STATE OF OREGON ET AL 3:17 –CV-1786 (SI)

MIDDLE DISTRICT OF ALABAMA MIRANDA
MITCHELL V THE STATE OF ALABAMA ET AL
2:17-CV-00768 (WC)

FEDERAL DISTRICT OF CONNECTICUT SUSAN
SKIPP ET AL V THE STATE OF CONNECTICUT 3:17-
CV-1974 (VB)

FEDERAL DISTRICT OF MASSACHUSETTS CAILIN
JAMES ET AL V THE COMMONWEALTH OF
MASSACHUSETTS ET AL   17-CV-12346 (PBS)

NORTHERN DISTRICT OF CALIFORNIA KRISTINA
KARKANEN ET AL V. STATE OF CALIFORNIA ET
AL 17 CV-06967 (SK)

FEDERA DISTRICT OF MASSACHUSETTS NIKKI
PATTIN ET AL V THE COMMONWEALTH OF
MASSACHUSETTS  1:17-CV-12469-PBS

1

**State of Connecticut Human Rights**
    **And Opportunities**
**State of Connecticut Court Support Services**
**Debra Kulak**
**State of Connecticut Family Services Office**
**Roger Frigon**
**Marcia Camp**
**John S. Martinez Fatherhood Initiative of Connecticut**
**State of Connecticut Family Commission**
**Connecticut Chapter of Association**
        **Of Family and Conciliatory Courts (CTAFCC)**
**Association of Family and Conciliatory Courts (AFCC)**

**Judge Lynda Munro(former)**
**Judge Elizabeth A. Bozzuto**
**Judge Alexandra D. DiPentima**
**Judge F. Herbert Grundel**
**Judge Robert E. Beach, Jr.**
**Judge Barry R. Schaller**
**Judge William J. Lavery**
**Judge Bethany J. Alvord**
**Judge Eliot D. Prescott**
**Judge Start D. Bear**
**Judge James P. Ginocchio**
**JudgeJohn A. Danaher III**
**Judge Elizabeth Gallagher**
**Judge John W. Pickard**
**David Dee, Magistrate Superior Court**
**State of Connecticut Support Enforcement Services**
**Hon. Chase Rogers**
**Hon. Patrick Carroll, III**
**Attorney Martin Libbin**
**Attorney Dina Mezza Menchetti**
**Menchetti at Law, LLC,**
**Lisa Rene Reynolds,**
**Attorney Stephen H. Levy,**
The Law Offices of Conti & Levy
**Porzio Law Offices, LLC,**
**Attorney Julie Porzio,**
**Estate of Eric H. Gaston/ Attorney Eric H. Gaston**
**Gaston Law firm**
**Louisa Krause,**
**Sidney Horowitz PhD,**
**Howard Krieger PhD,**
**Lauren Ayr PhD,**
**Connecticut Resource Group**

**Laura Erhardt  MF LMFT**
**Visitation Solutions, LLC**
**PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC**
**Dr. Bryon Round DDS**
**Dr.Mohammad Sohail Khera**
**Winsted Pediatrics**

**DEFENDANTS**

## COMPLAINT

Plaintiffs PAMELA DUDGEON EISENLOHR (herein Pamela Eisenlohr) alleges the following:

## INTRODUCTION

1. PAMELA EISENLOHR AND S.D.E. each a qualified individual with a mental health disability, (collectively, "Plaintiffs"), bring this complaint against the above-named Defendants State of CONNECTICUT, et al. (collectively "Defendants"), who are public and/or private entities.  From 2008 – present, Defendants have regarded Plaintiffs as being in need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy Eye movement desensitization and reprocessing (EMDR) for trauma, having separation issues, having trust issues, disgruntled, frivolous, having anxiety, with black and white thinking disorders as such collectively "Defendants" regarded S.D.E. as

3

disabled and regarded Pamela Eisenlohr as disabled and discriminated against Plaintiffs according to these perceived mental impairments. Defendants acted on assumptions and sex-based stereotypes about Plaintiffs' disabilities; and failed to individually analyze what services and supports would be appropriate considering those disabilities. Defendants refused to provide appropriate individualized treatment and accommodations necessary to ensure that Plaintiffs had full and equal opportunity to court proceedings to which Pamela Eisenlohr's parental rights and S.D.E. child's custody were at issue. Moreover, Defendants exploited Plaintiffs' disabilities.

2. This current situation is attributed to the actions of the State of CONNECTICUT et al, who gave the plaintiff mother a disability she did not have prior to Defendants unlawful and illegal acts. Plaintiff mother has been unlawfully coerced by the most of the defendants including that she as fears retaliation on her and S.D.E. her child continuing as of this filing. Plaintiffs are disabled and ask that the court be mindful that writing is a major life activity affected by disability. Constructing this claim, given a disability by some of the defendants, makes construction of this claim is a traumatic experience and significantly impacting the symptoms of disability.

3. Plaintiffs ask that the court Consider the Motion for Counsel simultaneously with this complaint.

4. This issue is a matter of significant public safety as it outlines a common problem among women and children subjected to domestic and family violence and the enabling of it for years. It is a business model employed by family court industry to

generate long term revenue stream and to use the already most vulnerable, those

victimized by domestic and family violence to assure a steady stream of revenue,

both by federal funding and payment of desperate mothers trying to protect their

children from abuse.

5. The plaintiffs' are providing Judicial Notice: "a parent who is a party to the
   lawsuit and who has the same interests as the child is a proper representative
   under Fed. R. Civ. P. 17(c). See generally T.W. by Enk v. Brophy, 124 F.3d 893,
   895-97 (7th Cir. 1997); see also In re Chicago, Rock Island & Pac. R.R. Co., 788
   F.2d 1280, 1282 (7th Cir. 1986)

6. Defendants' actions, inactions, and omissions here violate Title II of the Americans
   with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12131-12134, and
   its implementing regulation, 28 C.F.R. Part 35; Title III of the Americans with
   Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12181 *et seq.*, and its
   implementing regulation at 28 C.F.R. Part 36; and Section 504 of the Rehabilitation
   Act, 29 U.S.C. § 794.

7. Plaintiffs do not challenge or appeal a lawful State court decision

8. This matter raises an issue of general public importance.

9. "From the Public Health Perspective:  In the judicial system, a norm is established
   against discrimination on the basis of disability tying law closely to public health.1 Thus,
   it would seem that justice and public health in many ways are interdependent. However,
   public health and law are separate disciplines, and as Wendy Parmet, a leading expert
   on health, disability, and public health law puts it, "The legal perspective contrasts

dramatically with a public health population perspective. Legal reasoning tends to rely on analogy and deductive application of rules to facts. Public health works from empirical evidence and probabilistic reasoning." Including persons with disabilities providing equal stance in courts of law necessitates a blueprint that avoids exploitation of disabilities due to legal adversarial tactics.

10. The State of Connecticut practices discrimination and exclusion and retaliates against those who try to access their rights.  The disabled are denied meaningful due process, equal protection of law and meaningful access to the State of Connecticut's programs services and benefits. See case <u>SCOTT W. EISENLOHR v PAMELA D. EISENLOHR AC 33390</u>, <u>SCOTT W. EISENLOHR v PAMELA EISENLOHR  AC 36302</u>, <u>SCOTT W. EISENLOHR v PAMELA EISENLOHR  AC 37155</u>,   3:17 CV 01224 (MPS) 3:15 cv 141, (JAM) 3:17 cv, (MPS) 3:15 cv 01224 (MPS).    The State of Connecticut refuses to remedy the harm caused by their actions from 2008 to present on of the both similarly situated associated Connecticut cases here; the Plaintiffs and  as well as most who complain about the Action in Connecticut Courts, find themselves with these same two judges. In this case, Plaintiffs are profoundly similarly situated with those listed in association.


11. Plaintiffs intend to go to Multi district litigation with the cases listed "in association with" and many other similar filings in progress that are occurring over 20 states. Upon this court's issuance of a case number and serving such documents with service of this suit. Though these similarly situated as plaintiffs is in the millions, very few are able to attempt to vindicate their rights. No advocacy exists, no legal funds

exist, no support exists. These similarly situated have been abused and debased as is the Plaintiffs case here.

12.     Plaintiff mother, Pamela Eisenlohr has taken on mammoth efforts to vindicate her rights and those of her child S.D.E. She has been met with opinions that side step the law, ignore the legal issues. She raises and further ensures that plaintiffs and those similarly situated will be met with continued domestic and family violence, purposeful economic and emotional devastation to guarantee fathers have supremacy, even after a divorce.

13.     Protection from Abuse was never part of Welfare Fatherhood and Marriage Promotion programs. Instead of building these programs with a domestic violence component, protection for Mothers and children is obviously left out. https://www.fatherhood.gov/   There is no motherhood.gov website nor is there a parenthood.gov website. There is an obvious imbalance of check dams here and a lack of protections for women and children here as well as the government website is exists solely for fathers.

14.     The long history of ignoring abuse and its effects on women and children.

15. Plaintiffs were denied the right to present their case without intimidation, coercion and denied access to the justice system, denied access to affordable accommodations and denied equal access and due process because of plaintiff mother's status as a woman as a matter of practice and culture, de facto, woman do not have equal rights. However, they are taxed at the same rate as men, but no such "motherhood" funding streams into the states' family court systems, like billions of

dollars in "fatherhood funding" in streams into states and harms victims of abuse. Protection from Abuse was never part of Welfare Fatherhood and Marriage Promotion programs. Instead of building these programs with a domestic violence component, protection for Mothers and children was purposely left out; again an imbalance of check dams against women and children, worse if they are presumed disabled, worse if they are actually disabled, the degree of harm including harm from time stolen from them, from mental presumptions, social stigmas, and financial loss forced on them as well as put on these plaintiffs and those similarly situated is immeasurable harm.

16. Additional Constitutional questions are raised: Do women deserve equal rights to men if they are taxed at the same rate? Does "people" in the preamble to the Constitution of the United States include women? Are woman included in "all citizens" under the 14th Amendment to the Constitution of the United States? Further claim is a taxpayer lawsuit as plaintiff mother is an individual whose income is subjected to charges imposed by the state and federal government, for the benefit of that individual and others in order to prevent the unlawful diversion of public funds.

17. "The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." Tennessee v. Lane, 541 U.S. 509, 531 (2004) The Supreme Court in 2004, held that Title II of the ADA constitutes a valid exercise of Congress enforcement power under the Fourteenth Amendment in cases implicating the fundamental access to the courts. Discrimination on the basis of race,

color, national origin, age, or disability in federally assisted programs is prohibited. This prohibition applies to recipients of federal assistance and sub-recipients.

18. The Plaintiffs and those similarly situated across the United States are being discriminated and not allowed access to justice also resulting in the deprivation of honest services. The State of Connecticut et al (as well around the country) is willfully defrauding women from custody of their children and assets by exploiting their disabilities, discriminating against their disabilities, sex and marital status and providing faulty training, employing policies, standard approaches and models of "performance based contracting for father serving programs."  Taxpayer money mandates men receiving custody of minor children regardless of whether or not these men engage in physical, sexual and/or psychological abuse. The State of Connecticut allows a taxpayer enhanced, profit-generating industry dependent on abuse to franchise the family court system. Federal law states that an individual has the right to choose his or her own healthcare providers and decline as well. However, Plaintiffs were forced into several evaluations by the defendants where their mental health was questioned by providers they did not choose and to whom they objected.

19. Guardians ad Litem under the State of Connecticut Public Defenders' Office 2012 – present and Guardians ad litem who do not answer to any office and are appointed at ten times the rate the state found the service to be worth.. Such title III and title II entities that routinely mock, insult, scream, call names and use children to coerce favorable financial outcomes for themselves as found in the January 2014 and March 2014 public hearings in the Legislative office building in testimony from

hundreds of parents, available on CTN. They are not exempt from 42 USC 12203.

20.

1.   Defendants Gionocchio, Danaher, Gallagher, Pickard, Munroe, Grundel, Beach,

Schallar, Lavery, Alvord, Prescott, Bear, Dee, Levy, Porzio, Porzio Law, Gaston,Gaston

Law,  Horowitz, Krieger, Ayr, Connecticut Resource Group, Krause, Erhardt,

Department of Children and Families (DCF), Desmond, Reynolds, Khera, Mezza

Menchetti, Camp, Frigon, Litchfield Family Services were in full knowledge of the

domestic and family violence perpetrated by the plaintiff mother's former spouse Scott

W. Eisenlohr, The plaintiff mother as well as the child in this case reported and made

known numerous times to the defendants at multiple levels that there was on going

domestic violence against them including that Ms. Eisenlohr's former spouse and his

current spouse have been repeatedly charged and published with domestic violence,

trespassing,  and wailing at hammer in the plaintiffs home, both were allowed to enter

funded programs to discharge the charges against them at arrest hearings.  None of

these fatherhood funds or associated funded programs or even an ADA advocate or

supporting Domestic violence referrals were offered to plaintiffs by the defendants.  In

fact instead plaintiffs were isolated from each other, forced into mental fixing therapies,

supervised visitation, and told not to discuss or disclose domestic violence, and were

ordered to pay out of pocket not once were the plaintiffs allowed protections or honest

services as they were presumed to have some mental deficiency, this was done against

the disabled plaintiffs, on the backs of a disabled class.  Ms. Eisenlohr and S.D.E. were

considered disabled by the defendants including for mental condition deficiencies that

the defendants put on them - they have black and white thinking, ongoing anxiety,

stress, and associated traumas akin to PTSD including plaintiffs suffer years of lost time

and nurturing of their Mother/Daughter relationship, negative social stigmas, and

financial loss that they did not have prior to the negative actions of the defendants,

where too the defendants were informed and should have known.  Where plaintiffs

should have been offered more protections and services for disabled persons under the

law, ADA, and particularly for their domestic violence traumas and for the list of

presumed mental deficiencies, traumas including exasperated anxieties and black and

white thinking (traumas inclusive of such traumatic childhood event, stress, akin to

PTSD, **anxiety, black & white thinking appears on the DSM 5 spectrum of

personality disorders**) put on the plaintiffs by the defendants. Instead plaintiffs were

unreasonably treated by the defendants as plaintiffs were unreasonably victimized and

traumatized by defendants including being isolated from each other, deprived of

domestic violence protections, equal protections, ADA/ADAA as amended protections,

Constitutional rights, HIPAA rights, FERPA rights, rights to privacy, denied

wiretapping/recording consent rights, freedom of movement and appearance in public

arenas including on plaintiffs own residence street, denied consent rights for home

searches of plaintiffs residence, denied rights not to disclose mental health records, and

subjected to seizure of personal papers/documents,  and denied time (nearly 9 years),

family bonds, suffer loss of consortium, suffer financial devastation along with being

deprived  honest services.  Plaintiffs have not been charged with any crime nor have

been read any Miranda rights. While under the control of a domestic abuse (as is the

case here) or a slave-owner, a person's life itself is constantly being threatened, and

both mental and physical health are being diminished, which constitute injuries to the

Life Interest. In the case of slavery, the victim's Life Interest was converted into the owner's property and liberty interests. The same is true at the present time of domestic abuse both of adult and child plaintiffs. Defendants violated the plaintiffs by these actions and violated the right of plaintiff minors notably in Re Gault , 387 US 1 (1967) holding children are persons under the Constitution. The Second Circuit Court's recognition of the Life Interest is also implicit in Judge Weinstein's decision in Nicholson v Scopetta, when he pointed out that the government has a responsibility to protect victims of domestic violence and children who have been abused by their parents. The most minimalist state, he said, has the responsibility to protect its citizens from violence, and this should extend to violence within the home. Judge Weinstein specifically stated that victims of violence within the home are an especially vulnerable group deserving of special protection together with other protected groups covered under the Thirteenth Amendment. Plaintiffs in this case have repeatedly made known to defendants that they are victims of domestic violence.  Defendants often retaliate with motions of contempt against plaintiffs and those similarly situated when plaintiffs told of domestic violence happening to them or when they tried to protect their children. Such contempt motions are significant as the federal funding the courts receive through Fatherhood and Healthy Marriage harm mothers: "Among sanctions available for contempt are fines, jail time, and a change in custody." Page 62  Policy Studies Inc./Center for Policy Research, Access and Visitation: Promising Practices 2001/2002**. <u>SUCH WEAPONIZES CHILDREN AND PLACES BOTH CHILDREN AND MOTHER IN CRUEL AND UNUSUAL PUNISHMENT. SUCH USE OF CHILDREN IS OVERT ABUSE OF THEM AND NON-EXISTENT IN AMERICAN JURISPRUDENCE.</u>**

**JURISDICTION AND VENUE**

21. This Court has jurisdiction of this action under 28 U.S.C. § 1331, and 42 U.S.C. §§ 12133 and 12188.  The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court may grant attorney's fees pursuant to 42 U.S.C. § 12205

22. The acts and omissions of Defendants giving rise to this action occurred in Connecticut. Plaintiffs have been situated and aggrieved in Connecticut during a substantial portion of the events giving rise to this action, including present unmitigated harm occurring in this district, making venue proper in this judicial district pursuant to 28 U.S.C. § 1391.

23. The plaintiffs bring FRP 5.10 Constitutional Challenges

24. Enforcement by the United States Attorney General is invoked pursuant to 42 U.S.C. §§ 12133 and 12188

25. Jurisdiction is appropriate as the Plaintiffs will be filing papers to pursue Multi-district Litigation when a case number is issued and that summons may be served with this summons.

26. Plaintiffs bring under FRCP 5.10 a Constitutional challenge to the state of Connecticut's judicial practices claiming jurisdiction over closed dissolutions by stipulated agreements between parties.

27. Plaintiffs bring a FRCP 5.10 Constitutional Challenge to appointing mental health providers or any type of evaluation and STATE OF CONNECTICUT court  Support Services into a family court proceeding.

28. Plaintiffs bring FRCP 5.10 challenge to the Constitutionality of Guardians Ad Litem or law guardians involved in family cases.

29. Plaintiffs bring a FRCP 5.10 challenge to upholding the Ninth and Tenth Amendment to the Constitution to uphold the Connecticut Constitution prohibiting discrimination against sex, gender, marital status and disability. Specifically in Connecticut's Constitution states that- No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability. Connecticut Constitution, Article I, §20 (1984)

30. Plaintiffs bring FRCP 5.10 Constitutional Challenge the Connecticut Judicial System denying litigants access to its courts by arbitrarily as a retaliatory act to require leave to litigants to access its courts, especially disabled women.

31. Plaintiffs bring FRCP 5.10 Constitutional Challenge to the Connecticut Family courts using guardians ad litem to construct faulty parenting plans.

32. Plaintiffs bring FRCP 5.10 Constitutional challenge to the Connecticut Court Family Court System, the Connecticut Family Court Guardian Ad Litem usage, the State of Connecticut opening up closed cases without parties permission.

33. Plaintiffs bring FRCP 5.10 Constitutional Challenge to the State of Connecticut et al denying and interfering with the right to contract.

34. Plaintiffs bring a FRCP 5.10 Constitutional Challenge to the use of depriving mother's children to punish mothers, for bogus contempt filings, retaliation and thus depriving all of their liberty interest and enacting cruel and unusual punishment, as are all similarly situated.

## PARTIES

35. The United States has an Interest herein.

36. Plaintiff, Pamela Dudgeon Eisenlohr (herein Pamela Eisenlohr) resides in Litchfield County, 2 Winchester Avenue, Winsted, Connecticut

37. Plaintiff, S.D.E. is a minor individual who is the child of Pamela Eisenlohr

38. Defendant State of Connecticut, including its respective departments, agencies, and other instrumentalities, is a unit of local government in the State of Connecticut, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance.

39. Defendant, THE STATE OF CONNECTICUT JUDICIAL BRANCH including its respective departments, agencies, and other instrumentalities, is a unit of local government in the State of Connecticut, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance

40. Defendant, CHIEF JUSTICE Chase Rogers in the Courts of Connecticut in her leadership role as the administrators and managers of Connecticut's system, its courts, officers, and related offices and programs is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance. It is located at the State of Connecticut Supreme Court Building, 231 Capitol Avenue, Hartford, Connecticut 06106.  She is sued in her individual and official capacities

41. Defendant, Judge Patrick L. Carroll III, a judge as Chief Court Administrator in the Courts of Connecticut Court at the time of the events complained of herein, He is

being sued in his official and individual capacities is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  --- is a recipient of federal financial assistance located at the State of Connecticut Supreme Court Building, 231 Capitol Avenue, Hartford, Connecticut 06106.

42.  Defendant, Martin R. Libbin, Director Legal Services in the Courts of Connecticut Superior Court Operations Division Connecticut Hartford Court at the time of the events complained of herein. As Corporate Counsel for the State of Connecticut Judicial Branch he has signed settlement agreements concerning numerous known ADA violations and investigations.  He has  membership to the Connecticut Bar and legal acumen would provide he is aware of lawful and legal court procedure and that the court had no jurisdiction to open and modify the contract that two parents signed regarding the care, custody, financial consideration of the two plaintiff minor children and such was an interference of the plaintiff mothers right to contract, such interference is prohibited by 42 USC 12203 He is being sued in her official and individual capacities is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  --- is a recipient of federal financial assistance located at 100 Washington St. 3rd FL, Hartford Connecticut 06106

2.

43. Defendant, Debra Kulak, Deputy Director Services in the Courts of Connecticut Court Support Services Division Connecticut (CSSD) at the time of the events

complained of herein.   Defendant Mezz Menchetti worked under Debra Kulak in this CSSD division supervision including motioning the court under Defendant Judge Danaher asking to be removed from plaintiffs case because of "conflict" with staying on as guardian ad litem due to employment with Judicial Branch which was granted, however Mezza Menchetti is still listed as guardian ad litem in numerous other cases at the time and to present 2017.  She is being sued in her official and individual capacities is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  --- is a recipient of federal financial assistance located at 936 Silas Deane Highway, Wethersfield, Connecticut 06109

44. Defendant State of Connecticut Court Support Services Division of Family Relations share the mission statement of the Judicial branch: The mission of the Connecticut Judicial Branch is to serve the interests of justice and the public by resolving matters brought before it in a fair, timely, efficient and open manner. Nowhere are children and families considered stakeholders- or even considered at all.

45. Defendant The State's Attorney for Connecticut including its respective departments, agencies, and other instrumentalities, is a unit of local government in the State of Texas is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance.is responsible for the investigation and prosecution of all criminal matters in the State of Connecticut. It is an independent agency of the executive branch of state government, established under the Constitution of the State of Connecticut. It is

responsible to conduct criminal investigations brought to their attention via court inspectors. It is obligated to make its facilities accessible to people with disabilities.

46. Defendant Office of the Attorney General for the State of Connecticut was officially established in 1897. The Connecticut Constitution and General Statutes authorize the Attorney General to represent the interests of the people of the State of Connecticut in all civil legal matters involving the state to protect the public interest, and to serve as legal counsel to all state agencies. This office is also able to enforce the ADA/ADAAA, but choses not to in family court matters. This agency is also charged with consumer protection and enforce CUTPA, and investigate insurance fraud. The critical missions of this office are to represent and vigorously advocate for the interests of the state and its citizens by performing, with diligence and integrity, the duties and directives assigned to the Attorney General by law, to ensure that state government acts within the letter and spirit of the law, to protect public resources for present and future generations, to safeguard the rights of all consumers, including our most vulnerable citizens, and to preserve and enhance the quality of life of all citizens of the State of Connecticut. Their mission states they are to protect the most vulnerable citizens, including its respective departments, agencies, and other instrumentalities, is a unit of local government in the State of Connecticut is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance. It is obligated to make its facilities accessible to people with disabilities and uphold the Americans with Disabilities Act as Amended and Section 504 of the Rehabilitation Act of 1973.

47. Defendant The State of Connecticut Office of the Child Advocate is a unit of local government in the State of Connecticut is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance. The Office of the Child Advocate (OCA) is not an administrator of programs. Rather, the OCA monitors and evaluates public and private agencies that are charged with the protection of children, and reviews state agency policies and procedures to ensure they protect children's rights and promote their best interest. It is obligated to make its facilities accessible to people with disabilities.

48. Defendant The State of Connecticut Commission on Human Rights and Opportunities is a unit of local government in the State of Connecticut is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance. The mission of the Connecticut Commission on Human Rights and Opportunities is to eliminate discrimination through civil and human rights law enforcement and to establish equal opportunity and justice for all persons within the state through advocacy and education. It is obligated to make its facilities accessible to people with disabilities.

49. Defendant John S. Martinez Fatherhood Initiative of Connecticut is an entity of government for the state of Connecticut, incentive based funding, a broad-based, multi-agency, statewide program led by the Department of Social Services that is focused on changing the systems that can improve fathers' ability to be fully and positively involved in the lives of their children. Provides Fathers Legal assistance response to child support order(s) and/or access/visitation/custody order(s). is a unit

of local government in the State of Connecticut is a "public entity" within the meaning

of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It

is a recipient of federal financial assistance. It is obligated to make its facilities

accessible to people with disabilities.

50. Defendant, Connecticut Department of Children and Families ("DCF") including its

respective departments, agencies, and other instrumentalities, is a unit of local

government in the State of Connecticut is a "public entity" within the meaning of 42

U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a

recipient of federal financial assistance. Its mission: Working together with families

and communities for children who are healthy, safe, smart and strong is its mission

statement, they are tasked with protecting children from neglect and abuse. It is

obligated to make its facilities accessible to people with disabilities and uphold the

Americans with Disabilities Act as Amended and Section 504 of the Rehabilitation

Act of 1973.

51. Defendant State of Connecticut Court Support Services Division of Family Relations

share the mission statement of the Judicial branch: The mission of the Connecticut

Judicial Branch is to serve the interests of justice and the public by resolving matters

brought before it in a fair, timely, efficient and open manner. Nowhere are children

and families considered stakeholders- or even considered at all.

52. Defendant Connecticut Chapter of The Association of Family and Conciliatory

Courts, CTAFCC is a "private entity" within the meaning of 42 U.S.C. § 12181(1);

and is subject to the ADA and its implementing regulations. They are recipients of

financial assistance: this entity depends on disregarding the ADA/ADAAA to open

mothers' contract that two parents signed regarding the care, custody, financial

consideration of the two plaintiff minor children and such was an interference of the

plaintiff mothers right to contract.  It is obligated to make its facilities accessible to

people with disabilities.

53. Defendant The Association of Family and Conciliatory Courts, AFCC, is a "private

entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its

implementing regulations is a worldwide organization who generate a revenue by

creating programing for problems they create and sell their solutions as programing

and policies in Family Courts around the World. None of their programing is

compliant with ADA/ADAAA and they teach its members how to circumvent federal

laws and Constitutional Principles and Practices with local state rules. AFCC is the

Association of Family and Conciliation Courts – the premier interdisciplinary and

international association of professionals dedicated to the resolution of family

conflict.  AFCC members are the leading practitioners, researchers, teachers and

policymakers in the family court arena who create, train, sell, endorse programming

that violated the ADA/ADAAA and the State of Connecticut Constitutional Provision

the sex cannot be uses a means to discriminate. Instead of resolving conflict, its

members inject conflict, do not protect children from abuse or women from domestic

violence. It is obligated to make its facilities and programing accessible and not

discriminatory to people with disabilities. They were listed as registered in State of

Connecticut at one time at www.concord-sots.ct.gov under Business ID No. 0126858

with the "Agent Name" listed as SECRETARY OF STATE with an annual report due

date of 01/01/0001 with no other name history, mailing address 1720 Emerson St.
Denver Colorado 80218

54. Defendant, <u>Judge Lynda Munro (former),</u> AFCC Board Member, was the Presiding
Judge of the Family Division of the Connecticut Judicial Branch at the time of the
events complained of herein.  She is sued in her individual and official capacities:
she ran/runs several businesses/trade organizations from inside the courts during
the events complained of herein, she is a "private entity" within the meaning of 42
U.S.C. § 12181, and is subject to the ADA and its implementing regulation.  These
businesses include: the Association of Family and Conciliation Courts - Connecticut
branch (AFCC-CT, headquartered in Madison, WI); and three other LLC's that
provide consulting and training in and around the family courts.  Each is a recipient
of federal financial assistance.  Her principal office and place of business is located
in New Haven, CT. She is also sued in her private, individual and official capacities
in LLCs as a vendor of faulty services via CTAFCC and AFCC. She is also the
principal in Defendants FAB FOUR and TRAINING SOLUTIONS. She is also
regarded as a service provider under CGS 33-182a. As a judge, her passing the
Connecticut Bar Exam and as Administrative Judge for the Family Courts of
Connecticut demonstrate that she is aware of lawful and legal court procedures and
the harm that that she cannot modify the contract that two parents signed regarding
the care, custody, financial consideration of the two plaintiff minor children and such
was an interference of the plaintiff mothers right to contract, such interference is
prohibited by 42 USC 12203. However, abiding by laws conflicts with her business.
She is sued in his individual and official capacities is a "public entity" within the

meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  She is a recipient of federal financial assistance. She presided over illegal and unlawful proceedings. She also created the AFCC Guardian Ad litem training.

55. Defendant, Elizabeth Bozzuto, a judge in the Courts of Connecticut was the Presiding Judge of the Family Division Connecticut Hartford Court at the time of the events complained of herein.  She is being sued in her official and individual capacities is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  --- is a recipient of federal financial assistance located at 90 Washington St. Hartford, Connecticut 06106

56. Defendant, Judge James P. Ginocchio was a judge of the Family Division of the Connecticut Litchfield County court, Head Administrative judge at the time of the events complained of herein.  He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance located at 50 Field St., Litchfield Connecticut 06790

57. Defendant, Judge John A. Danaher III was a judge of the Family Division of the Connecticut Litchfield County court, Head Administrative Judge at the time of the events complained of herein.  He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance located at 50 Field St., Litchfield Connecticut 06790

58. Defendant, Judge John W. Pickard was a judge of the Family Division of the Connecticut Litchfield County court at the time of the events complained of herein. He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance located at 50 Field St., Litchfield Connecticut 06790

59. Defendant, Judge Elizabeth Gallagher was a judge of the Family Division of the Connecticut Litchfield County court at the time of the events complained of herein. She is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance located at 50 Field St., Litchfield Connecticut 06790

60. Defendant, David Dee was a Magistrate Superior Court of the Child Support Enforcement Family Court Division of the Connecticut Litchfield County court at the time of the events complained of herein.  He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance located at 50 Field St., Litchfield Connecticut 06790

61. Defendant Connecticut Support Enforcement Services was Superior Court Child Support Enforcement for Family Court Division of the Connecticut Litchfield County court at the time of the events complained of herein.  It is being sued in its official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient

of federal financial assistance located at 11 Scoville St. Waterbury Connecticut 06702 c/o Donna Pedrolini, Supervisor

62. Defendant, Judge Alexandra D. DiPentima was the Chief Judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. She is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

63. Defendant, Judge F. Herbert Grundel was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. He also served as presiding judge in Connecticut Family Court when AFCC programing was brought into the State of Connecticut Family Relations and Fatherhood Legislation. As a judge, and member of the Connecticut Bar, his legal acumen would provide he is aware of lawful and legal court procedure, the harm that occurs when lawful and legal procedure isn't followed, and that the court had no jurisdiction to open and modify the contract that two parents signed regarding the care, custody, financial consideration of the two plaintiff minor children and such was an interference of the plaintiff mothers right to contract, such interference is prohibited by 42 USC 12203. He sat on the bench twice during plaintiffs appeals and has sat on the bench during appeal hearings for associated similarly situated Skipp case. He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

64. Defendant, Judge Robert E. Beach Jr was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. He sat on the bench twice during plaintiffs appeals and has sat on the bench during appeal hearings for associated similarly situated Skipp case. He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

65. Defendant, Judge Barry R. Schaller was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

66. Defendant, Judge William J. Lavery was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

67. Defendant, Judge Bethany J. Alvord was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein. She is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation. It is a recipient of federal financial assistance

68. Defendant, Judge Eliot D. Prescott was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein.  He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance

69. Defendant, Judge Stuart D. Bear was a judge of the State of Connecticut Appellate Court Division of the Connecticut Hartford court at the time of the events complained of herein.  He is being sued in his official and individual capacities, is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and is subject to the ADA and its implementing regulation.  It is a recipient of federal financial assistance

70. Defendant, Dina Mezza Menchetti (also known as Fiorendina Menchetti and Fiorendina Mezza) is an independent attorney, member of the Connecticut state and local Bar Association and Litchfield County Bar Association.   Defendant Mezza Menchetti  was assigned  appointed guardian ad litem for S.D.E. including she was aware of domestic violence in the home, of multiple charges of the same against S.D.E.'s father, and of S.D.E.'s reports of domestic violence by her father on multiple occasions S.D.E. even reported to her school authorities and therapist who reported to DCF.  Mezza Menchetti also worked under Debra Kulak in this CSSD division supervision including motioning the court under Defendant Judge Danaher asking to be removed from plaintiffs case because of "conflict" with staying on as guardian ad litem due to employment with Judicial Branch which was granted, however Mezza Menchetti is still listed as guardian ad litem in numerous other Connecticut family cases at the time and to present 2017.  She is both a "public entity" within the

meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42

U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  She

is a recipient of federal financial assistance.  She is located 3611 Terramore Dr.

Melbourne, Florida 32940-8028 AND at location 86 Bridgewater Dr. Avon, CT 06001.

She is being sued in her official and individual capacities.

71. Defendant, Menchetti at Law LLC is an independent law firm, member of the

Connecticut state and local  Bar Association and Litchfield County Bar Association,

actively registered doing business under ID 07020025.  It is both a "public entity"

within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning

of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.

It is a recipient of federal financial assistance.  It is located at 62 Cook St. Torrington,

CT 06790 c/o Dina Mezza Menchetti AND at location 86 Bridgewater Dr. Avon, CT

06001 c/o Dina Mezza Menchetti. It is being sued in its official and individual

capacities

72. Defendant, Julie Porzio is an independent attorney, member of the Connecticut state

and local  Bar Association and Litchfield County Bar Association.  She is both a

"public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within

the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing

regulations.  She is a recipient of federal financial assistance.  In 2005 she sued the

State of Connecticut over a divorce shooting case in which she herself was injured

and her client was murdered in a domestic violence family case, Porzio had a

publicized diagnosis of trauma PTSD (akin to disabilities of the plaintiffs here) for

which she was routinely accommodated as disabled by the Judicial Branch for years

before settling her case in 2012 and Porzio  and her staff  at defendant Porzio Law Offices LLC listed below - should have known ADA requirements for the disabled plaintiffs benefit here in this case as well as those similarly situated across the board in Connecticut, in addition she employed and supervised defendant Gaston as joint counsel against plaintiffs here and he was staff Associate Counsel. She is located at 25 State St Waterbury Connecticut 06790 AND 72 MiddleWay East, Waterbury Connecticut 06708 AND 34 Southgate Rd. Waterbury Connecticut 06708. She is being sued in her official and individual capacities.

73. Defendant, Porzio Law Offices LLC is an independent law firm, member of the Connecticut state and local  Bar Association and Litchfield County Bar Association, actively registered doing business under ID 0667134.  In 2005 owner Julie Porzio sued the State of Connecticut over a divorce shooting case (Bochicchio) in which she herself was injured and her client was murdered by spouse in a domestic violence family case, Porzio had a publicized diagnosis of trauma PTSD (akin to disabilities of the plaintiffs here) for which she was routinely accommodated as disabled by the Judicial Branch for years before settling her case in 2012 and Porzio and her staff  at defendant Porzio Law Offices LLC  – the Domestic Violence and PTSD akin to plaintiffs disabilities is pointedly relevant here in Plaintiffs case and they knew or should have known ADA requirements for the disabled plaintiffs benefit here in this case as well as those similarly situated across the board in Connecticut. In addition she employed defendant Gaston as Senior associate and joint counsel against plaintiffs here. Gaston was likely an aware insider of her 2005 published domestic violence murder injury case against the State of Connecticut which settled

in 2012.  It is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  It is a recipient of federal financial assistance.  It is located at 25 State St. Waterbury Connecticut 06702 c/o Julie Porzio. It is being sued in its official and individual capacities

74. Defendant, "Erich H. Gaston,  ESTATE of " was an independent attorney, member of the Connecticut state and local Bar Association and Litchfield County Bar Association AND was an Employee and/or Contractor at/with defendant Porzio Law LLC with member owner defendant Julie Porzio and  Gaston was at her supervisory direction or under Porzio contract specification obligation at the time of the events complained of herein  This defendant is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  He is a recipient of federal financial assistance.  The Estate of Erich H. Gaston is located at 403 3rd Avenue West Haven Connecticut 06516 c/o Alison P. Gaston  P.O. Box 108 West Haven Connecticut 06516. It is being sued in its official and individual capacities.

75. Defendant, Gaston Law Firm is an independent law firm, member of the Connecticut state and local Bar Association and Litchfield County Bar Association, doing business in Connecticut.  It is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  It is a recipient of federal financial assistance.  It is located at is located at 403 3rd Avenue West Haven

Connecticut 06516 c/o Alison P. Gaston  "Kelly Services" P.O. Box 108 West Haven
Connecticut 06516. It is being sued in its official and individual capacities

76. Defendant, Connecticut Resource Group LLC (CRG), is a business located in
Waterbury CT, but operating all over the State of Connecticut.  Via  employment and
appointments,  are a recipients of federal financial assistance CRG is a recipient of
federal financial assistance for training and appointments implemented or attended
from 2006 to present, and is a recipient of federal financial assistance. They are also
regarded as a service providers under CGS 33-182a. It is both a "public entity" within
the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42
U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.

77. Defendant, Sidney Horowitz, PhD, AFCC member is an independent mental health
provider licensed by the State of Connecticut.  He is associated partner with CRG.
He is sued in his individual and official capacities. He is also regarded as a service
provider under CGS 33-182a. Located at 133 Scoville Rd, Waterbury CT 06706

78. Defendant, Howard Krieger, PhD, AFCC member is an independent mental health
provider licensed by the State of Connecticut.  He is associated partner with CRG as
well as a CTAFCC contractor and training instructor for the guardian ad litem training
programs in Connecticut. He is sued in his individual and official capacities. He is
also regarded as a service provider under CGS 33-182a. Located at 133 Scoville Rd,
Waterbury CT 06706

79.

1.   Defendant, **Lisa Rene Reynolds** LMFT is an independent mental health provider
licensed by the State of Connecticut and doing business in Bantam Connecticut.

She is a "private entity" within the meaning of 42 U.S.C. § 12181 and its

implementing regulation. She is both a "public entity" within the meaning of 42

U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1);

and is subject to the ADA and its implementing regulations.  She/he is a recipient of

federal financial assistance.   She is a recipient of federal financial assistance. She

is located at 601 Bantam Rd, Bantam, CT 06750

80.

2.   Defendant,  **Lauren Ayr PhD** is an independent mental health provider licensed by

the State of  Connecticut and doing business in Connecticut Resource Group. She

is a "private entity" within the meaning of 42 U.S.C. § 12181 and its implementing

regulation. SHE   is both a "public entity" within the meaning of 42 U.S.C. §

12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is

subject to the ADA and its implementing regulations.  She/he is a recipient of federal

financial assistance.   She is a recipient of federal financial assistance. She is

located at Located at 133 Scoville Rd, Waterbury CT 06706

81. **Louisa Krause**

3.   Defendant, **Louisa Krause** is an independent mental health provider licensed by the

State of Connecticut and doing business in Canton CT. She  is a "private entity"

within the meaning of 42 U.S.C. § 12181 and its implementing regulation. SHE   is

both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity"

within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its

implementing regulations.  She/he is a recipient of federal financial assistance.   She

is a recipient of federal financial assistance. She is located at 50 Albany Turnpike

Bldg 4 Canton CT 06019.

82. **Laura Erhardt  MF LMFT**

Defendant, **Laura Erhardt  MF LMFT** is an independent mental health provider licensed

by the State of  Connecticut and doing business as owner of  Visitation Solutions and

**PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC**  Brookfield

CT. She  is a "private entity" within the meaning of 42 U.S.C. § 12181 and its

implementing regulation. SHE   is both a "public entity" within the meaning of 42 U.S.C.

§ 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is

subject to the ADA and its implementing regulations.  She/he is a recipient of federal

financial assistance.   She is a recipient of federal financial assistance. She is located at

246 Federal Rd, Ste C141 Brook Field, CT 06804.


83. Visitation Solutions LLC is a "private entity" within the meaning of 42 U.S.C. § 12181

and its implementing regulation.  is both a "public entity" within the meaning of 42

U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1);

and is subject to the ADA and its implementing regulations.  is a recipient of federal

financial assistance.   is a recipient of federal financial assistance. Owned by Erhardt

is located at 246 Federal Rd, Ste C141 Brook Field, CT 06804.


84. **PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC**  Visitation

Solutions LLC is a "private entity" within the meaning of 42 U.S.C. § 12181 and its

implementing regulation.  is both a "public entity" within the meaning of 42 U.S.C. §

12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is

subject to the ADA and its implementing regulations.  is a recipient of federal

financial assistance.  is a recipient of federal financial assistance. Owned by Erhardt is located at 246 Federal Rd, Ste C141 Brook Field, CT 06804.

85. **Attorney Steven H. Levy,** Defendant,  is an independent attorney, member of the Connecticut state and local  Bar Association and Litchfield County Bar Association. He is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  He is a recipient of federal financial assistance.  He is located at 355 Prospect St Torrington CT 06790, doing business within The Law Offices of Conti & Levy.  He is being sued in his official and individual capacities.


86. The Law Offices of Conti & Levy Defendant,  is an independent firm, member of the Connecticut state and local  Bar Association and Litchfield County Bar Association. is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  He is a recipient of federal financial assistance.  is located at 355 Prospect St Torrington CT 06790, doing business with partner Levy and is being sued in  official and individual capacities.


87. **Dr. Bryon Round DR DDS**  is a "private entity" within the meaning of 42 U.S.C. § 12181 and its implementing regulation.  is both a "public entity" within the meaning of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is subject to the ADA and its implementing regulations.  is a recipient of federal financial assistance.   Is a dentist, orthodontist, DDS, medical doctor required by oath to do no harm, is a recipient of federal financial assistance. Located

at 227 Main St, Torrington CT  06790 is sued in his personal and professional

capacities

88. **Dr.Mohammad Sohail Khera**  MD is a "private entity" within the meaning of 42 U.S.C.

§ 12181 and its implementing regulation.  is both a "public entity" within the meaning

of 42 U.S.C. § 12131(1); and "private entity" within the meaning of 42 U.S.C. §

12181(1); and is subject to the ADA and its implementing regulations.  is a recipient

of federal financial assistance.   Is a medical doctor required by oath to do no harm,

is a recipient of federal financial assistance. 115 Spencer St, Winsted, CT 06098

sued in his personal and professional capacities

89. **Winsted Pediatrics** is a "private entity" within the meaning of 42 U.S.C. § 12181 and

its implementing regulation.  is both a "public entity" within the meaning of 42 U.S.C.

§ 12131(1); and "private entity" within the meaning of 42 U.S.C. § 12181(1); and is

subject to the ADA and its implementing regulations.  is a recipient of federal

financial assistance.   is a recipient of federal financial assistance. Owned by  Khera

located at 115 Spencer St, Winsted, CT 06098


**FACTS**

At all times herein, Plaintiff  Pamela Dudgeon Eisenlohr (Pamela Eisenlohr) is a female

and biological mother of S.D.E.

4.   The United States Department of Health and Human Services (HHS) and the United

States Department of Justice (DOJ) issued a technical assistance manual in August

2015, stating:   "Title II of the ADA applies to the services, programs, and activities of

all state and local governments throughout the United States, including child welfare agencies and court systems. The "services, programs, and activities" provided by public entities include, but are not limited to, investigations, assessments, provision of in-home services, removal of children from their homes, case planning and service planning, visitation, guardianship, adoption, foster care, and reunification services. "Services, programs, and activities" also extend to child welfare hearings, custody hearings, and proceedings to terminate parental rights."

5. Title II authorizes suits by private citizens for money damages against public entities that violate § 12132. See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).

6. In March 2017, Karin Wolf filed a complaint of disability discrimination and other acts prohibited by The Americans with Disabilities as Amended Act. (ADA/ADAAA) Case no. 2:2017-cv-02072. In her complaint, she claimed her cause of action and included in her cause of action "and those similarly situated."

7. In October 2017, Susan Skipp filed a complaint of disability discrimination and other acts prohibited by The Americans with Disabilities as Amended Act. (ADA/ADAAA) Case no. In the Southern District of New York, case number 3:17- cv-. In her complaint, she claimed her cause of action and included in her cause of action "and those similarly situated."

8. Plaintiffs as of this filing date are similarly situated with those others they have listed in association with in this case and as with many others similarly situated across the United States.

9. In the year 2005, Ms. Eisenlohr obtained a dissolution by agreement contract after divorce was sought by the parties in 2003, It is AFTER she entered this contract that she is seeking the Federal Court to determine plaintiffs rights were violated, two years earlier, and after Ms. Eisenlohr and S.D.E. moved out of the marital home due to domestic violence and she also left participation in the parties home based business. The JOD incorporated a Property Settlement Agreement with bargained-for terms, providing Ms. Eisenlohr with joint legal custody of S.D.E. with residential custody of S.D.E. with Ms. Eisenlohr, child support and alimony paid to Ms. Eisenlohr by former spouse Scott W. Eisenlohr, including specific bi-weekly weekend time and weekly Wednesday time for former spouse Scott W. Eisenlohr, specific vacation for both parties, specific alternating holiday schedule for both parties, including that former spouse Scott W. Eisenlohr to provide and pay for insurance coverages including medical and dental and out of pocket related expenses for plaintiff child S.D.E. The child S.D.E. was diagnosed with Systemic Juvenile Rheumatoid Arthritis (SJRA) before age two. Ms. Eisenlohr moved in with her mother less than 2 miles away from her former spouse and resides in Winsted Connecticut and S.D.E. attends school in the Winsted School District. The parties handled visitation exchange thereafter in the Winsted Police Department lobby.

10. According to the U.S. Dept. of Justice, gender bias against women in child custody proceedings is prevalent, especially where abuse is alleged (Saunders' report, 2012).

11. The Association of Family and Conciliation Courts (AFCC) promotes the use of mental health issue alienation, "PAS", and other mental health accusations against mothers and children in family courts across the country.

12. The State of Connecticut Judicial Branch and through its' actors and/or vendors such as the CT Association of Family and Conciliation Courts (CT AFCC) and its AFCC members, Connecticut Resource Group, Sidney Horowtiz PhD, Howard Krieger PhD, are involved in with and design training strategies to Connecticut Guardian ad litems and through advertised seminars which promotes the use of mental health issue alienation, "PAS", and other mental health accusations against mothers and children in Connecticut family courts.

13. The State of Connecticut Judicial Branch and through its' actors and/or vendors such as the CT Association of Family and Conciliation Courts (CT AFCC), its AFCC members such as  Connecticut Resource Group, Sidney Horowtiz PhD, Howard Krieger PhD, Lauren Ayr PhD are involved in with and design training strategies to Connecticut Guardian ad litems and through advertised seminars which promotes the use of mental health issue alienation, "PAS", and other mental health accusations against mothers and children in Connecticut family courts are routinely assigned to Connecticut child custody cases through court orders assigned a for a barrage of mental health and testing evaluations

14. The State of Connecticut Judicial Branch court ordered assigned Connecticut Resource Group, Sidney Horowitz PhD, Howard Krieger PhD, and Lauren Ayr PhD

to the Plaintiffs for family mental health evaluations, mental health testings, and cognitive therapies

15. It is the policy of the State of Connecticut and its agencies to routinely use a hoops platform using psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy <u>Eye movement desensitization and reprocessing</u> (EMDR) for trauma, having separation issues, having trust issues, disgruntled, frivolous, anxiety, with black and white thinking disorders and other mental health accusations against women and children in family court proceedings.  This policy has a disparate impact that adversely affects women and children.

16. The State of Connecticut, et al., failed to inform Ms. Eisenlohr of their policy to give preferential treatment to fathers, and that they were acting out of financial motivation, to obtain professional fees and federal "access" grants via The Healthy Marriage and Responsible Fatherhood (HMRF) initiative.

17.  Because Defendants regarded Ms. Eisenlohr as having need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making

mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy Eye movement desensitization and reprocessing (EMDR) for trauma, having separation issues, having trust issues, disgruntled, frivolous, having anxiety, with black and white thinking disorders. The court was biased against her according to this sex-based stereotype. As a result, Plaintiffs could not fully and equally participate in court proceedings.

18. Defendants did not refer Plaintiffs to a disability accommodations coordinator at the courthouse or at any other location, during the pendency of the family court proceedings, nor offer accommodations to the Plaintiffs. As a result, Plaintiffs could not fully and equally participate in court proceedings.

19. Title II entities have not complete self-evaluations for any of the program, policies, interagency agreements that the plaintiffs were forced to use. If such evaluations took place, harm could have been mitigated. per § 35.105 Self-evaluation. Part (d) of this section is important because most entities purport that they did self-evaluations in 1993. **However, the law changed twice,** and evaluations that take in consideration these changes show a good faith effort on the entity's behalf. This is not the case here. (d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

20. Defendants faked the existence of a mental health impairment, namely plaintiffs were presumed and targeted to be in need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy Eye movement desensitization and reprocessing (EMDR) for trauma, having separation issues, trust issues, disgruntled, frivolous, having anxiety with black and white thinking disorders as a cause of action for segregating Plaintiffs.

21. Defendants stereotyped and stigmatized Ms. Eisenlohr and repeatedly acted on assumptions about Ms. Eisenlohr and mental illness mental impairment.

22. Defendants perpetuated the use of alienation on the plaintiffs by forcing plaintiffs be separated, confined, and naming plaintiffs to presumably need psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy Eye movement desensitization and reprocessing

(EMDR) for trauma, having separation issues, having trust issues, disgruntled, frivolous, having anxiety, with black and white thinking disorders as a real syndrome to prejudice Ms. Eisenlohr, her child S.D.E. and other women in the family courts

23. State and Federal laws such the Health Insurance Portability and Accountability Act of 1996 (HIPAA) provide that an individual has the right to privacy and nondiscrimination, the right to choose and decline their own healthcare providers, the right to a trusting relationship with their mental healthcare providers, and the right to Informed Consent.

24. Further, the Fourth Amendment protects the right to privacy, and the Fifth Amendment protects a person from being compelled to incriminate oneself in such evaluations or therapy ordered by the court.

25. Defendants forced or coerced Plaintiffs into several evaluations where their mental health was questioned by providers Ms.Eisenlohr did not choose and to whom she specifically objected in open court due to lack of trust. Moreover, Plaintiffs mental health was discussed in open court. This created a hostile environment for the Plaintiffs.

26. Ms. Eisenlohr also has your actual disability and the physical symptoms it presents She has been deemed disabled by the Social Security Administration and has received treatment accordingly.

27. From 2008 - present, defendants including the State of Connecticut, Connecticut Judicial Branch, and Litchfield Family Court has regarded Plaintiffs as each having one or more mental health disabilities, mainly alienating behaviors

28. Pamela Eisenlohr is a qualified individual with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131(2).

29. S.D.E. is a qualified individual with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131(2).

30. According to the American Psychological Association (APA), there is no reliable empirical data to support the so-called phenomenon of "Parental Alienation Syndrome." Or alienation This "syndrome" and similar ones are used almost exclusively against women, as is the case for plaintiffs here

31. The APA has repeatedly theory of "Parental Alienation Syndrome" (PAS) for inclusion in the Diagnostic and Statistical Manual of Mental Disorders.

32. According to the U.S. Dept. of Justice, gender bias against women in child custody proceedings is prevalent, especially where abuse is alleged (Saunders' report, 2012).

33. The Association of Family and Conciliation Courts (AFCC) promotes the use of "PAS" and other mental health accusations against mothers and children in family courts.

34. In years 2008 -2012 also ordered Plaintiffs into custody evaluations with Connecticut Resource Group (CRG), Kreiger, Horowtiz, Ayr, to assess them. The court ordered Ms. Eisenlohr to pay approximately $5000 for the cost of the evaluator; and this was a forced and coerced contract.

35. The Litchfield Superior Connecticut Court did not inform Ms. Eisenlohr who the evaluator would be, nor if this court appointee was vetted by the State of Connecticut to comply with anti-discrimination statutes.

36. Defendants through its's platforms used orders, and assigned agencies and evaluators grilled Ms. Eisenlohr and the child S.D.E.. through multiple agencies and orders and threats and emails, and through confinement and isolation and used reports mental health records, and fake presumed mental health defects as fact to formulate their report that states that Ms. Eisenlohr and the child S.D.E. had mental health issues relating to alienation, "PAS", Black & White thinking, separation, anxiety  traumas akin to  PTSD inter alia.

37. From years discussed Ms. Eisenlohr's mental health with her therapist and applicable records with her forced supervised visitation agencies, which in turn, they used against her and included in their written reports.  These reports were provided to the Court and accessed by Ms. Eisenlohr former husband Scott W. Eisenlohr, Sandra Tralongo Eisenlohr, Mezza Menchetti, Gaston, Porzio, Camp, Frigon, Krause, Ayr, Erhardt, Reynolds and discussed in open court.

38. Plaintiffs rights to their mental health records were deemed waived by the State of Connecticut court(s) as ordered by Judge Danaher, III in his written orders, released by Danaher's court order without  Ms. Eisenlohr's prior permission or knowledge, without her signed releases, or by coercion and under threats including her mental health records were handed over funneled over to various non-parties, defendants, agencies, Family Services, including opposing Attorneys Porzio, Attorney Gaston,

Attorney Mezza Menchetti as Guardian ad litem, Lauren Ayr PhD,  Howard Krieger PhD, Sidney Horowitz PhD, Connecticut Resource Group, plaintiff's former spouse, plaintiff's former spouse's current spouse, and discussed in various arenas such as open court, reports, and in publications without her permission. This created a hostile environment for the Plaintiffs.

For nearly nine years, Plaintiffs, who were presumed to be mentally deficient given disabilities that they did not have; were repeatedly denied honest services protections by the defendants being further ordered to repeated hoops of mental evaluation therapy;  transferred to multiple supervised visitation agencies;  multiple psycho-social intervention Cognitive-behavioral therapists;  ordered subjected to wiretapping recording;  stripping them of privacy rights and the right to consent; were ordered and subjected to random home invasions by Mezza Menchetti including being stripped of personal documents, personal papers, personal property, privacy rights and right to consent; ordered subjected to limited freedom of movement and access in around public areas, events, schools, residential street (these orders were extended to Plaintiff's core family home and family members as well including Marjorie Dudgeon, Grandmother to S.D.E. and Deborah Keevers, Godmother to S.D.E. and her husband Joseph Keevers who were also insinuated to be somehow mentally deficient as well to be excluded from plaintiff child S.D.E.'s life).   On the backs of disabled, the defendants subjected plaintiffs and those similarly situated to financial ruin by defendants actions, added plaintiffs suffered years of repercussions retaliation with defendant's interference actions wlth medical insurances; Family Educational Rights and Privacy Act (FEPA); TITLE II Privacy under HIPAA; Child support; State of Connecticut Revenue Services

and applicable taxes attachments; Internal Revenue Services and applicable taxes attachments; medical records; mental health records; therapy records; provider/care giver and educational records; Family Services records; loss of employment; and including but not limited to interferences with Social Security Administration & Disability denied access for applications for the benefit of plaintiff child S.D.E. and applicable records; passports United States and International travels; defendants aiding and abetting concealment of a child including out of the United States; allowing third party inferences of concealment of a child S.D.E. and parental rights; causing a loss of consortium on the plaintiffs Mother/Child relationship; loss of parental rights;  plaintiffs rights to family; added defendants have placed liens and/or caused financial hardships/ attachments on plaintiffs property and related  income resources.  At one point; defendants Danaher, Mezza Menchetti, Gaston, Porzio, and Erhardt even coerced Ms. Eiselnohr to prepay veterinary spaying vet bills in advance and turn over plaintiff's family pet cat to her former spouse under threats that supervised visitations would cease altogether for plaintiffs access to each other.  Ms. Eisenlohr made arrangements for the cat spaying and delivery of the family pet to the Winsted Police Station after which defendants greatly reduced plaintiffs access to each other anyway, changed supervised visitation agencies, revised orders unilaterally calling supervised visitation and reunification reduced to therapeutic visitation; declared Ms. Eisenlohr as bizarre; nearly eliminating all access and bonding avenues for plaintiffs through any supervised visitation agency because Ms. Eisenlohr's former spouse and his current spouse reportedly threatened police intervention on them, threatened to remove the child S.D.E. from visits,  refused to cooperate therapists. This is well documented in reports,

46

motions, and transcripts, filed in SCOTT W. EISENLOHR v PAMELA EISENLOHR

LLIFA03-0091072 S.  These actions by the defendants, singularly, in concert, at the

behest of, or by court order, and by Danaher ignoring as well, combined with created a

hostile environment for the Plaintiffs who were treated presumed as disabled, given

disabilities that they did not have, treated as disabled, diagnosed by, threatened and

coerced by and ultimately systematically denied honest services, denied rightful

protections, and rights under the law. Plaintiffs rights were controlled by the Connecticut

courts, its actors, its's agencies, transferred to third parties, therefore denied outright

including Ms. Eisenlohr's  rights were transferred to further interfered with by given to

the defendants, and given to her former spouse by the defendants, at the behest of the

Guardian ad litem Mezza Menchetti, at the behest of Laura Erhardt Visitation Solutions,

Lousia Kruse, at the behest of Camp, Frigon, DCF, Desmond, Krieger, and at times

handed over to the disabled child S.D.E. herself to decide her mother rights and her

own access to Ms. Eisenlohr.  Ms. Eisenlohr was coerced to change from her personal

therapist to another because apparently she was not being treated or being mentally

conditioned properly by her psycho-social intervention Cognitive-behavioral therapists,

such  therapy was not apparently "in the spirit" of the orders under Danaher who

indicated that the situation had "MORPHED" into something else, and according to

Mezza Menchetti, Gaston, Porzio;  all expenses for any supervised time was ordered to

be paid out of pocket as punishment for Ms. Eisenlohr verses utilizing any insurances

that would cover plaintiff s, child S.D.E. for their mental, alienated, or other mental

trauma deficiency. Defendants decided that child S.D.E. needs "therapeutic" type

verses reunification supervised visitation verses any reunification.  Defendant Danaher

ignored this, refused plaintiff motions altogether and at times stated it was too late also indicating that the child was getting older and that Ms. Eisenlohr was frivolous. Plaintiffs, S.D.E., was used as a weapon conditioned by defendants through a mental deficient platform of evaluations, mental therapies, supervised visitation, treated extensively by various psycho-social intervention Cognitive-behavioral therapists as being alienated, used against her mother Ms. Eisenlohr. Plaintiffs, Ms. Eisenlohr, was used by the defendants as a weapon against her child S.D.E. in the use of the very same mental deficient platform. The State of Connecticut defendants use similar redundant platforms of hoops on mothers, children, disabled, on those associated and similarly situated. The plaintiffs both reported domestic abuse on them by Ms. Eisenlohr's former husband. Defendant Judge Gionocchio in open court cites only Ms. Eisenlohr as having dealt with domestic abuse on her by her former spouse, there was no proof that the child S.D.E. had suffered abuse from him, but decided Ms. Eisenlohr was setting up the former spouse, removed the child, dissolved the entire separation agreement contract with supervised visitation and mental health therapy ordered for plaintiffs while waiting for DCF, Desmond to report back, Mezza Menchetti was designated to handle interim supervised visitations, a majority of which was denied. The child S.D.E. had prior reported abuse by father to several teachers at her school and her therapist after spending several days with her father; Mezza Menchetti also reported to DCF that S.D.E. was being abused by father. DCF was called in by the school when the child reported against her father, took off her shirt showing multiple bruises front and back. DCF, Desmond and others investigated as did defendants Mezza Menchetti, the Winsted Police, CT State Police, Nina Livingston MD, Hartford

Children's Medical Hospital because plaintiff child S.D.E. had multiple bruises front and back on her body after spending several days with father. DCF did not remove the child from Ms. Eisenlohr sent the child home with her with a developed a safety plan that was followed by Ms. Eisenlohr for the plaintiffs; the same plan was refused  by her former spouse and Gaston and Porzio who claimed "parental alienation" threatened to sue DCF. In turn, DCF returned a report 2 months later after the child was removed from Ms. Eisenlohr's custody by defendant Gionocchio and placed in sole custody of father, isolated from her mother Ms. Eisenlohr.  DCF found both Ms. Eisenlohr and her former spouse of emotional neglect recommending mental health therapy and counseling for S.D.E., Ms. Eisenlohr, and her former spouse. Added that defendants Family Services, Frigon, Camp, Mezza Menchetti would handle family division. DCF report notes that Mezza Menchetti had a theory.  Plaintiffs, Ms. Eisenlohr was already 7 years out of the marital home with S.D.E., moved in with mother Marjorie Dudgeon including the plaintiffs were each already in therapy due to domestic violence.  Ms. Eisenlohr's former spouse unilaterally immediately pulled all releases from all the child's therapists and any at Northwest Center for Family Service & Mental Health and evaluators defendants Connecticut Resource Group, Krieger to discontinue therapy treatment for S.D.E. and Ms. Eisenlohr's former spouse was given sole custody of the child S.D.E.  Mezza Menchetti as Guardian ad litem wanted S.D.E. in therapy filed motions for S.D.E. child mental health therapy, filed motions to seal S.D.E.'s mental health records, filed motions to collect her fees from Ms. Eisenlohr, notified and worked with defendants Judge Pickard, Judge Danaher, Judge Gallager, Levy, Porzio, Gaston, Camp, Frigon to seal S.D.E. records and at her behest to have Ms. Eisenlohr continue with mental health

therapy even after she was discharged. Mezza Menchetti filed motions to have S.D.E.

start another round of therapy with Lauren Ayr, PhD with Connecticut Resource Group,

defendants suggesting less time for plaintiff's access to each other, that S.D.E. just

wants to be a kid. Defendant Mezza Menchetti also communicated prior with defendant

Lisa Rene Reynolds (therapist with Focus On Kids Program at Northwest Center for

Family Service & Mental Health) who relayed concerns for the child acting against her

father and divulged plaintiffs records between them which Mezza Menchetti as

Guardian ad litem did not report Reynolds concerns to the court prior to the custody

change.  Ms. Eisenlohr was coerced by defendants Mezza Menchetti, Porzio, Gaston,

Danaher to change her therapist Edith Heath PhD to another, in open court this

therapist was referred to as a quack, and her letter citing dragonian measures that

Mezza Menchetti and the court had taken against the plaintiffs, and that defendant

Mezza Menchetti had not contacted her on request but apparently Mezza Menchetti

demanded  Ms. Eisenlohr's mental health records first for her review.  Ms. Eisenlohr

after coercion chose defendants Connecticut Resource Group with therapist Michela

Kauffmann; Ms. Eisenlohr could not get any evaluation or MMPI records that the

plaintiffs were forced into by the court (at CRG) (by defendants Judge Gionocchio and

Judge Danaher) from defendants Connecticut Resource Group, Krieger concerning her

own or her child's records as she was told by Krieger that those court ordered

evaluations and  her testings of the Minnesota Multiphasic Personality Inventory (MMPI)

is a psychological test that assesses personality traits and psychopathology  used

primarily intended to test people who are suspected of having mental health or other

clinical issues) belonged to the court that ordered them and would not be released to

her added that she was ex parte, did not have a lawyer. Ms. Eisenlohr could not get those same records transferred interoffice either from defendants Krieger, or defendants Connecticut Resource Group to her own therapist Kauffmann within Connecticut Resource Group; Ms. Eisenlohr being ordered to additional therapy paid twice for MMPI testing; no issues of mental illness were found for Ms. Eisenlohr on testing.  Ms. Eisenlohr was tested satisfactorily released now by two of her therapists with no mental issues just stresses and anxiety of situational ongoing traumas on her (notably akin to post tramatic stress disorder –PTSD) both therapists recommended more time for plaintiff Ms. Eisenlohr to be together with her child S.D.E., also each noting Ms. Eisenlohr was subjected to domestic violence and concerns for the MOTHER/CHILD relationship.  After being released from her therapists and providing documentation as to completing all requirements of defendant Judge Danaher III's orders;  Defendant Danaher ordered less and less time, overlooked his own written orders on plaintiffs time after time causing significate loss of time; nearly eliminating all contact for plaintiffs; adding  **defendant Danaher ordered that since Ms. Eisenlohr  had "largely completed" her mental health therapy** that she now had those dollars to pay for child support; ordered Ms. Eisenlohr to pay child support on earning capacity that he imput into the calculation form as she was unemployed. Danaher still  and repeatedly presumed and regarded plaintiff Ms. Eisenlohr as being mentally deficient disabled; ordered less access on a presumption, further isolating the plaintiffs from each other on mental presumptions and stigmas diagnosed on Ms. Eisenlohr  by Danaher and from Danaher's court bench. Defendant Lauren Ayr, PhD per Danaher's orders at the behest of Mezza Menchetti treated and released plaintiff S.D.E. without notifying Ms. Eisenlohr

for several months, reported to the court that S.D.E. was no longer visiting her mother,

has some sort of pendulum issue. Defendant Mezza Menchetti reported on S.D.E. using

Plaintiff Ms. Eisenlohrs email content and obtained and used Ms. Eisenlohr's mental

health records without her permission with S.D.E.'s mental health records to compile a

report which noted  S.D.E. losing her relationship with her mother suggesting less time

access for isolated disabled plaintiffs.  Ms. Eisenlohr appealed numerous court orders

regarding removal of  the child S.D.E.,  and went through mammoth efforts for access to

her child S.D.E. and trying to vindicate their rights for their Mother/Daughter relationship

including challenging ADA/ADAA as amended with technical manual, 504, and the

presumptions of mental deficiency, alienations, deprivation, and associated traumas

akin to PTSD put  on plaintiffs and their family ignored by defendants including through;

Connecticut Family Court, Judge James P. Ginocchio, Judge John A. Danaher III,

Judge John W. Pickard, Judge Elizabeth Gallagher; Connecticut Appellate Court, Judge

F. Herbert Grundel, Judge Robert E. Beach, Jr., Judge Barry R. Schaller, Judge William

J. Lavery, Judge Bethany J. Alvord, Judge Eliot D. Prescott, Judge Stuart D. Bear;

including other superiors Judge Lynda Munro(former), Judge Alexandra D. DiPentima,

Judge Elizabeth A. Bozzuto had knowledge of numerous complaints brought to public

attention by many affected families similarly situated by the similar actions of plaintiffs

named defendants (a short list), DOJ investigations, internal memos, settlement

agreements, and through various public testimony regarding Guardian ad litems, family

court complaint cases, including Judge Bozzuto testified on the same including on

supervised visitation can have negative effects on children.  These forenamed judges

had a duty of care to protect the plaintiffs and those similarly situated, failed or refused

to do so. Defendants Judge Grundel and Judge Beach actually sat twice on Ms.

Eisenlohr's appeals and were made aware of presumptions of mental issues, alienation,

and ADA violations against plaintiffs these same judges ruled on similar cases including

associated Skipp cases of which mental health deficiency issues and ADA/ADAA as

amended with 504 violations were specifically raised put on the record to the

Connecticut Appellate court where defendants Grundel and Beach sat and heard.

Plaintiff Ms. Eisenlohr personally attended at least one of Skipp's appeals on these very

issues complained here. In Ms. Eisenlohr's  appeal cases mentally deficiencies issues

put on plaintiffs by the defendants under ADA/ADAA with manual as amended were

never addressed or mitigated in any court. Defendant Danaher even passed these

plaintiffs concerns over at his own bench to divert multiple issues to the Appellate court

who never addressed any ADA issues or mitigated any.  Like Skipp, Plaintiff Ms.

Eisenlohr has gone through mammoth efforts through the Connecticut courts (with

Danaher declaring the SCOTT W. EISENLOHR v PAMELA EISENLOHR case no LLI-

FA03-0091072 S the largest Litchfield case) and jumped through multiple hoops of

mental evaluations and persecution by the defendants  for years trying to protect S.D.E.

and herself while defendants diagnosed plaintiffs with phantom disabilities, caused real

disabilities, and stole time on the backs of disabled, robbed them depriving them of

honest services, rights, and protections, even pitting plaintiffs against their abuser while

they suffered domestic violence and deflection tactics at the hands of Ms. Eisenlohr's

former spouse who has been repeatedly charged with domestic violence, offered state

funded programs to obtain nolle, only to be charged again with domestic violence after

defendants removed custody of S.D.E. from Ms. Eisenlohr to her former spouse. This

custody switch was done on the backs of a presumed disabled person, without Ms.

Eisenlohr having an attorney, without DCF removing the child, without ADA protections

or attorney for S.D.E. and at the behest of her former spouse, on a long chain of behest

of the defendants and on their knowledge being informed, hearing public testimony,

knowing of DOJ investigations on these issues including defendants Martin Libbin,

Patrick Carroll authoring letters and signing settlements contracts made to inform

defendants at various levels regarding ADA/ADAA as amended violations and other

various concerns and/or by public input notifications that have never been upheld;

notably on the backs of these plaintiffs and those similarly situated disabled including

those listed in association.    The Appellate court allowed Mezza Menchetti to be

dismissed from scheduled appeal appearances because she requested by letter going

to school for social work training; Mezza Menchetti dismissed medical reports of child

being afraid of her father, abuse on her by father were not accidental bruises, orders

reflecting mental deficiencies and on S.D.E., child's full name published in court chosen

publications along labeled mental issues to be forever harmed stigmatized.  In reports

presented to court and in open court a supervised visitation therapist Judie Gorra

testified on behalf of the plaintiffs with concerns for the child mental condition,

Mother/Daughter relationship, threats, accusations, interferences from father and his

wife. Defendant Gaston deflected Ms. Eisenlohr as bizzare, refused to coorperate, and

grilled for another change of visitation agencies (three in all), tried eliminate all time for

plaintiffs, including tried to get Ms. Eisenlohr to turn over property items and the family

cat to the former spouse. Ms. Eisenlohr eventually did so under constant threats by

former spouse and Gaston;  Defendant Danaher agreed and ordered another change

agency, another therapist, less time, dismissed the issues once again. The defendants and Gallagher and Danaher aided and abetted child S.D.E. out of the country and out of school by a third party by former spouses' mother, and aided in concealment of S.D.E., and aided concealment of information and records concerning her against Ms. Eisenlohr as did defendants  DEE, Round, and Khera repeatedly too, they were aware of plaintiffs mental deficiency labels each time any set of  Danaher's court orders was published or given to them personally to follow and of HIPAA, ADA, discrimination policies as well as Round and Khera and Winsted Pediatrics  are licensed in Connecticut and treat citizens of Connecticut in their business health locations. Defendants focused on age of child, how long child had been with father – not ADA violations and mental health deficiencies presumptions, or faulty labels and interferences put on disabled plaintiffs; they refused, diverted it, failed to address it or mitigate while put undue burdens on minor child plaintiff S.D.E. and Ms. Eisenlohr. Defendant Danaher failed to address it, failed to address recent arrests of domestic violence in S.D.E's residences (child resides with her father and lives between two named residences father's house and his current wife's house, both have a history of published domestic violence in close proxy to and in the presence of S.D.E.) Also Defendant Danaher and Gallagher aided and abetted concealment of a child out of the country to Italy and refused passport and relevant information when the plaintiff Ms. Eisenlohr discovered that S.D.E. had been taken out of school without notification 10 days prior and brought such to the courts attention; Defendant Danaher intercepted Gallagher and took over as judge on those recent matters, disregarding his own orders, domestic violence, S.D.E. being out of the country, and Frigon's recent diagnosis on S.D.E. as having  "Black and White" thinking,

as well dismissing denying all issues and causing more isolation, lack of protections, once again on the backs of disabled plaintiffs. No self-evaluations done here either, just total elimination, damage, harm, and desecration to plaintiffs family and their rights as another long list of abuse of judicial discretion on plaintiffs and those similarly situated. Plaintiff should absolutely not have to wait until the child S.D.E. ages out of the system and plaintiffs rightful issues become considered moot or that the issues become further deemed "not in the spirit" of the orders or further allowed "MORPHED" into something else given the public importance of ADA, Constitutional, discrimination protections for all people not just those similarly situated disabled mentioned here. The defendants el al are not immune here given the extensive harm they have caused on the plaintiffs and those similarly situated; defendants et al should have known.

39. "Threats to disclose or disclosure of disabled litigants' confidential information is a form of discrimination and violates the Constitutional right to privacy. The Constitution provides that no state shall deny to any person within its jurisdiction the equal protection of the laws and provides for Due Process of law. Disabled Litigants' right to confidentiality is inherent in the ADA/ADAAA statutory scheme as well is protected under several federal and state laws, including the Health Insurance Portability Act (HIPAA). The ADA/ADAAA applied in conjunction with other federal laws, provides protection at a level greater or equal to that provided by other federal and state laws, and prevails over any conflicting the ADA/ADAAA" ADA Title II Technical Assistance Manual, II-1.4200.

40. This includes manifestation of a disability when defendants decided that plaintiffs presumably needed psycho-social intervention Cognitive-behavioral therapy (CBT)

for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders inclusive of mental health therapies or the conditions put upon them, being traumatized, being in need of EMDR psychotherapy Eye movement desensitization and reprocessing (EMDR) for trauma, having separation issues, having trust issues, anxiety, with black and white thinking disorders are manifestations of Ms. Eisenlohr's and S.D.E.'s actual disability of defendant(s) caused traumas on the plaintiffs of separation stress, isolation, loss of consortium with anxiety disability on the DSM-5 spectrum as actually diagnosed.  In 2016, Roger Frigon, Head of Litchfield Family Services diagnosed S.D.E. as having "Black and White thinking" which she did not have prior to the negative actions of the defendants and was not diagnosed by any of her therapists as having this, and Mr. Frigon reported in writing as he had concerns of her as having "Black and White thinking" in his report which was presented to the court again under Judge Danaher, III. "Black and White thinking" is listed on the DSM-5 as a personality disorder. Again, No self-evaluations were done here either, no services were offered for disabled plaintiffs here either, and plaintiffs were again deprived of honest services.

41. The defendants' actions and inactions, most relevant are the prohibitions of 42 USC 12203-, which grossly manifested into physiological symptoms including being anxious, stressed, hypervigilant, shaky, nauseated, having  headaches and nervous stomach.  Ms. Eisenlohr was visibly ill and under duress; had difficulty breathing and

had to medicate herself was unable to cope and communicate effectively in court; and unable to fully understand the proceedings.

42. The State and its agencies did not inform Ms. Eisenlohr if any of the defendants she was forced to engage with or assigned such as Litchfield Family Services, Frigon, Camp, Menchetti At Law, Mezza Menchetti, Connecticut Resource Group, Horowitz, Krieger, Ayr, State of Connecticut Department of Families, Desmond, DCF, Visitation Solutions LLC, PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC, Erhardt, Reynolds, Krause as such mental health provider, guardian ad litem, supervised visitation, evaluators, attorney, or any other ordered or connected agency put forced on plaintiffs was vetted by the State of Connecticut to comply with anti-discrimination statutes.

43. The State of Connecticut et al did not provide Ms. Eisenlohr a full and equal opportunity to benefit from its services in support of reunification with her child S.D.E..

44. The defendants et al, inclusive of State of Connecticut any state agencies involved such as Litchfield Family Services, Frigon, Camp, Menchetti At Law, Mezza Menchetti, Connecticut Resource Group, Horowitz, Krieger, Ayr, State of Connecticut Department of Families, Desmond, DCF, Visitation Solutions LLC, PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC, Erhardt, Reynolds, Krause are obligated to make reasonable efforts to maintain the family unit and to prevent the unnecessary removal of a child from his or her home. They did not make those efforts in regard to Plaintiffs.

45. The State of Connecticut and its agencies are inaccessible to Plaintiff Ms. Eisenlohr

46. Because the Defendants exploited Plaintiffs' disabilities, it has rendered Ms. Eisenlohr and her known and unknown diagnoses including anxiety, stress issue traumas akin to PTSD and other physical tolls so severe that she does not trust them, has lost faith in the legal system, and cannot effectively communicate with them to retrieve and access her child.

47. Ms. Eisenlohr has experienced physiological impairments accompanying her known and unknown diagnoses including anxiety, stress issue traumas akin to PTSD and other physical tolls so severe that negatively affect major life activities and bodily functions - significant loss of sleep, depression, anxiety, difficulty concentrating, lack of focus, and difficulty breathing, inter alia. Ms. Eisenlohr has had to seek a significant amount of medical treatment to mitigate her condition (i.e. ER visits, therapy, medications).

48. These traumas on her akin to PTSD are not curable. The duration and manifestations of Ms. Eisenlohr diagnoses including anxiety, stress issue traumas akin to PTSD and other physical tolls are greater than six (6) months and are lifelong. Ms. Eisenlohr health and disabilities have been further exasperated by such traumas as the defendants have put on her added she has deemed disabled by the Social Security Disability Administration. Studies consistently show that individuals with such trauma stress and PTSD similar aliments have an increased risk of dying from coronary heart disease.

49. The State of Connecticut Court support services put AFCC programing into court services in 2006.

50. The state of Connecticut put "fatherhood legislation incorporated into family court services.

51. Health and Human Services "Fatherhood Funding" is matched by the state of Connecticut as are other states around the country. Nowhere in the HHS report "A Collaboration and Strategic Planning Guide for States: Child Access and Visitation Programs" is there any mention that the entire program is entrenched in litigation; that families are extorted to pay exorbitant legal fees in order to have any standing in the court system. In fact, litigants without representation are routinely punished and ruled-against. Women usually have lower incomes than men so they quickly become disadvantaged. Abusive men frequently control the family assets. Many mothers- such as these similarly situated, who do receive support have to spend that money paying lawyers to fight to maintain custody. Such lack of parity exists in the Connecticut courts that the plaintiff mother Ms. Eisenlohr and others similarly situated, with a disability was required to go unrepresented when her former spouse had (7) counsel in these illegal and unlawful post judgment custody scams.

52. Nowhere in that same HHS report is it mentioned that mediators, co-parenting coordinators, and all other ordered court service providers become heavily involved in litigation and even, make judicial determinations, often, solely to ensure themselves continued court-ordered clients. Again, the HHS report never mentions adherence to State laws, guaranteeing due process protections, ethical standards

and oversight, the current child care arrangement and future needs of the children or

assessing the cause of the family break-up in the first place.

53. HHS reports often substitute the word "noncustodial" parent for father.  It is merely a

euphemism, in the same manner that custody has been changed to access/visitation

or parenting time.  A thorough reading of documents makes it clear that the program

runs solely to benefit fathers.  When Mom is made non-custodial, she is not offered

services to get her increased custody; when she is eliminated, she is not offered

reunification. While counted as participants, Mothers are merely mandated to

cooperate and they are punished by complete loss of their children, jailing, financial

impoverishment and psychological devastation when they attempt to protect their

children from an abusive male.  As plaintiff claims and on behalf of those similarly

situated. Abuse is called "conflict" on this platform wheel.  Fighting and prolonged

litigation is sustained and encouraged.  Recovery from abuse, self-help and

empowerment are denied under this perpetual system.  Because of OCSE's

fatherhood access/visitation mandate, the litigation and court service provider

industry flourishes to the great detriment of the women and children who are forced

to use it

54. Access/visitation programs that create corrupt litigation are highly successful in court

jurisdictions that operate "The Ferguson Model" that is, where wealthy, privileged,

power-elite prey and profit from the underclass.  Fathers, lawyers, mental health

practitioners, court appointees, and judges are the haves.  Mothers and children are

the have-nots.  The haves must deplete all resources from mothers (and family and

friends who contribute to the litigation struggle) in order that they may continue to have; the system works only for those at the top.

55. Inclusion of the fatherhood access/visitation mandate in Child Support administration was pure genius for the fatherhood movement. Paying practitioners to become involved in custody litigation with support office funds facilitated the sabotage of State custody laws which offered the protection from abuse that women had won: laws that required courts to consider abusive behavior as detrimental when determining custody; laws that forbid orders to attend counseling with the abuser; laws that put children's needs above parents desires.

56. Money paid in support is not tax-deductible, yet alimony payments are a line-item tax deduction. This makes it financially advantageous for a well-off man to obtain primary custody and to prolong, or break-up, a divorce settlement by paying off mother through alimony, instead of a one-time settlement and support payments. (Which the plaintiff mother sought) Rather than be financially punished by letting mother parent the children, men prefer to obtain primary custody and then defer parenting to their Mothers, new girlfriends or wives, or even stranger

57. In order to achieve this financial advantage for fathers, especially men with higher incomes, the access/visitation mandate does not require courts to adhere to state custody laws that require abusive behavior, and even friendly-parent provisions, to be considered. Courts are not required to adhere to the Rules of Evidence or Due Process. Court service providers are not required to adhere to any ethical standard.

When custody is increased for fathers, it is decreased for mothers, a fact never mentioned in any government literature.

58. Such contempt motions are significant as the federal funding the courts receive through Fatherhood and Healthy Marriage harm mothers: "Among sanctions available for contempt are fines, jail time, and a change in custody." Page 62  Policy Studies Inc./Center for Policy Research, Access and Visitation: Promising Practices 2001/2002. **SUCH WEAPONIZES CHILDREN AND PLACES BOTH CHILDREN AND MOTHER IN CRUEL AND UNUSUAL PUNISHMENT. SUCH USE OF CHILDREN IS OVERT ABUSE OF THEM AND NON-EXISTENT IN AMERICAN JURISPRUDENCE.**

59. Defendants have failed to mitigate the ongoing harm complained of herein.

60. Plaintiffs reserve the right to expand these proceedings.

## CAUSE OF ACTION

## COUNT I

## TITLES II AND III OF THE AMERICANS WITH DISABILITIES ACT

61. Paragraphs above are re-alleged and reasserted as if fully set forth here.

62. Ms. Eisenlohr is an individual with diagnoses including anxiety, stress issue traumas akin to PTSD and other physical tolls and regarded by Defendants as an individual having alienating bizarre frivolous behaviors.  She required appropriate individualized treatment and accommodations necessary to ensure full and equal access to court proceedings concerning her parental rights and the custody of her

minor child S.D.E.; accordingly, she is a qualified individual with a disability as defined by 42 U.S.C. §§ 12102 and 12131(2). anxiety, stress issues traumas akin to PTSD, Black & White thinking and PTSD is listed under "predictable assessments" under the ADA and its implementing regulation. Plaintiffs disabilities must be assessed without regard to mitigating measures.

63. S.D.E. is a minor child regarded by Defendants as individuals having alienation "PAS." Anxiety and Black & White thinking. They required appropriate individualized treatment and accommodations necessary to ensure full and equal access to court proceedings concerning their custody and their mother's parental rights; accordingly, they are each a qualified individual with a disability as defined by 42 U.S.C. §§ 12102 and 12131(2). Plaintiffs' disabilities must be assessed without regard to mitigating measures.

64. Because the actions complained of herein occurred from 2010 to present, the greatly expanded definition of the ADA Amendments Act of 2008, Final Rule of 2016, and parallel State law changes apply.

65. Ms. Eisenlohr and S.D.E. have anxiety that they did not have prior to the defendants causing traumas and isolation on her and her child S.D.E. S.D.E. also has Systemic Juvenile Rheumatoid Arthritis (SJRA) an autoimmune system disorder. S.D.E. was interviewed also apparently diagnosed in January 2017 by defendant Roger Frigon Head of Litchfield Family Services as having "Black and White thinking" which she did not have prior to the defendants causing traumas and isolation on her and her mother Ms. Eisenlohr. Ms. Eisenlohr was not informed of S.D.E.'s new mental

diagnosis or interview until a court hearing held in March 2017.  Anxiety and "Black and White thinking" each are  actual invisible disabilities which fall under actual mental impairment/psychiatric injury and physiological impairment, which substantially limit one or more major life activities and are listed on the DSM-5 spectrum.  Ms. Eisenlohr also has had additional debilitating tolls on her health on top of the already exasperated actual traumas, stresses, anxiety, and defendant claimed mental deficient assumptions on her which required hospitalizations, surgeries, treatments, medications, and extensive recovery including she has been deemed legally disabled by the Social  Security Administration. Ms. Eisenlohr has records of such impairments.

66. Plaintiffs' disabilities anxiety, stress issues traumas akin to PTSD fall under the greatly expanded *regarded as* prong of the ADA.  Ms. Eisenlohr has court records of such perceived mental impairments.

67. *Major life activities* and *substantial limitations* are to be construed as broadly as possible under the ADAAA and its implementing regulations.

68. Under the ADAAA, "major life activities" include "major bodily functions."

69. Plaintiffs do not have to identify any major life activity or bodily functions that are substantially limited, under the ADAAA and its implementing regulations, but have.

70. Defendants have subjected Plaintiffs to an ongoing mental war zone from year 2008– present.  The U.S. military does not send any personnel on a tour lasting over 278 days as it is found to cause harm.

71. Each day that passes adds incremental harm.  Ms. Eisenlohr 's anxiety, stress

issues traumas akin to PTSD cannot be treated until the ongoing trauma ends.  A

mitigating measure and remedy would require the restoration of Plaintiff's child to

Plaintiff mother, per enforcement of the JOD.

72. Defendants have failed to mitigate the harm they have done to Plaintiffs.

73. Unmitigated harm is a continuing cause of action.

74. Ms. Eisenlohr's fighting for her child S.D.E. is a major life activity.

75.  The Defendants The State of Connecticut, The State of Connecticut Judicial

Branch, The State of Connecticut Attorney General, Connecticut Office of the State's

Attorney, The State of Connecticut Department of Children and Families, State of

Connecticut Department of Advocacy And Protection, The State of Connecticut Bar

Grievance Counsel, The State of Connecticut Judicial Review Counsel, State of

Connecticut Office of the Child Advocate, State of Connecticut Human Rights And

Opportunities, State of Connecticut Court Support Services, Debra Kulak, State of

Connecticut Family Services Office, Roger Frigon, Marcia Camp, John S. Martinez

Fatherhood Initiative of Connecticut, State of Connecticut Family Commission,

Connecticut Chapter of Association Of Family and Conciliatory Courts (CTAFCC),

Association of Family and Conciliatory Courts (AFCC), Judge Lynda Munro(former)

Judge Elizabeth A. Bozzuto Judge Alexandra D. DiPentima, Judge F. Herbert

Grundel, Judge Robert E. Beach, Jr., Judge Barry R. Schaller, Judge William J.

Lavery, Judge Bethany J. Alvord, Judge Eliot D. Prescott, Judge Start D. Bear,

Judge James P. Ginocchio, Judge John A. Danaher III, Judge Elizabeth Gallagher,

Judge John W. Pickard, David Dee Magistrate Superior Court, State of Connecticut

Support Enforcement Services, Hon. Chase Rogers, Hon. Patrick Carroll, III,

Attorney Martin Libbin, Joette Katz, Elizabeth Desmond listed are a government or a

department, agency, or other instrumentality of a State or State government;

accordingly, Defendants are public entities as defined in 42 U.S.C. § 12131(1).

76.  Defendants Attorney Dina Mezza Menchetti, Menchetti at Law, LLC, Lisa Rene

Reynolds, Attorney Stephen H. Levy,  Conti & Levy, Porzio Law Offices, LLC,

Attorney Julie Porzio, Estate of Eric H. Gaston/ Attorney Eric H. Gaston, Gaston

Law, Louisa Krause, Sidney Horowitz PhD, Howard Krieger PhD, Lauren Ayr PhD,

Connecticut Resource Group, Laura Erhardt  MF LMFT, Visitation Solutions, LLC,

PSYCHOTHERAPY ASSOCIATES OF WESTERN CONNECTICUT, LLC,  Dr.

Bryon Round DDS, Dr.Mohammad Sohail Khera, Winsted Pediatrics are private

entities within the meaning of 42 U.S.C. § 12181.

77. Defendants are subject to both Title II and Title III of the ADA because of contractual

arrangements.

78. Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be

denied benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."

79. Title III of the ADA, 42 U.S.C. § 12182, provides that: "No individual shall be

discriminated against on the basis of disability in the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

80. Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(ii), provides that: "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."

81. Defendants removed Ms. Eisenlohr's child S.D.E. from her custody and effectively terminated her parental rights based on regarding her as having a cognitive impairment "PAS" alienation or being in need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders other alienating and the sex-based stereotype of that "mental impairment"; regarding her as having some cognitive mental deficiency and based on Ms. Eisenlohr's anxiety, stress issues traumas akin to PTSD and assumptions about this mental impairment.  As a result, S.D.E. has been discriminated against on the basis of their association with an individual with a disability.

82. Defendants have intentionally discriminated against Plaintiffs as qualified individuals with disabilities, on the basis and stereotypical assumptions of those disabilities, and through contractual arrangements, in the full and equal opportunity of their services, programs, activities, facilities, privileges, advantages, and accommodations, in violation of Title II of the ADA, as amended, 42 U.S.C. § 12131 *et seq.*, and its implementing regulation at 28 C.F.R. Parts 35; Title III of the ADA, as amended, 42 U.S.C. § 12181 *et seq.*, and its implementing regulation at 28 C.F.R. Parts 36, by, inter alia:

83. Denying Plaintiffs the opportunity to participate in or benefit from Defendants' honest services, programs, activities, facilities, privileges, advantages, and accommodations in violation of 28 C.F.R. § 35.130(b)(1)(i); and 28 C.F.R. §§ 36.201, 36.202, and 36.203.

84. denying Plaintiffs an opportunity to participate in or benefit from Defendants' services, programs, activities, facilities, privileges, advantages, and accommodations that is not equal to that afforded to Ms. Pamela Eisenlohr's former husband is in violation of 28 C.F.R. § 35.130(b)(1)(ii); and 28 C.F.R. §§ 36.201, 36.202;

85. limiting Plaintiffs in the enjoyment of the rights, privileges, advantages, or opportunities enjoyed by Ms. Pamela Eisenlohr's former husband, in violation of 28 C.F.R. § 35.130(b)(1)(vii); and 28 C.F.R. §§ 36.201, 36.202;

86. utilizing criteria or methods of administration that had the effect of subjecting an individual with a disability to discrimination on the basis of disability or that have the

purpose or effect of defeating or substantially impairing accomplishment of the objectives of Defendants' honest services, programs, and activities with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3); and 28 C.F.R. §§ 36.301(a) and 36.204;

87. selecting vendors, forcing/coercing Plaintiffs into, and entering into, contractual arrangements to be used to evaluate Plaintiffs' mental health that had the effect of excluding Plaintiffs from, denying them the benefits of, or otherwise subjecting them to discrimination and disparate treatment, or that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' honest services, programs, and activities with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130 (b)(1)(v) and (b)(4); and 28 C.F.R. §§ 36.201, 36.202, and 36.203.

88. failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the Defendants can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity, in violation of 28 C.F.R. § 35.130(b)(7); and 28 C.F.R. § 36.302;

89. failing to administer Defendants' services, programs, and activities in the most integrated setting appropriate to the needs of persons with disabilities, in violation of 28 C.F.R. § 35.130(d); and 28 CFR 36.203;

90. failing to operate Defendants' services, programs, activities, and facilities so that, when viewed in its entirety, it is readily accessible to and usable by mothers and

their children, in the most integrated setting appropriate, in violation of 28 C.F.R. §§ 35.150 and 35.151; and 28 C.F.R. § 36.203;

91. refusing to offer and provide appropriate individualized treatment and accommodations necessary to ensure full and equal opportunity for Ms. Eisenlohr and her child S.D.E. to participate in Defendants' honest programs, services, and activities;

92. stereotyping and stigmatizing Ms. Eisenlohr and repeatedly acting on assumptions about Ms. Eisenlohr's disabilities in violation of 28 C.F.R. § 35.130(h); and 28 C.F.R. § 36.301(b);

93. perpetuating the use of  Parental Alienation Syndrome, parental alienation, alienating actions, acting bizarre, being manipulative, being over protective, using maternal instincts, wanting to maintain the status quo, making mountains out of mole hills, making up domestic violence, putting labeling on such as "disgruntled" also used (as defendants used here) unknown mental health issues as accusations, including using presumptions of  undiagnosed mental health deficiencies as a real syndrome and defect to prejudice Ms. Eisenlohr, other women, including those similarly situated in the family courts is in violation of 28 C.F.R. § 35.130 (b)(1)(v); and 28 C.F.R. § 36.301;

94. excluding or otherwise denying equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association, in violation of 28 C.F.R. 35.130(g);

95. depriving the Plaintiffs of their honest services;

96. blocking representation by an attorney for Plaintiffs to protect their rights;

97. segregating Plaintiffs from each other based on disability;

98. effectively terminating Ms. Eisenlohr's parental rights based on disability and sex;

99. retaliating against Plaintiffs in violation of 28 C.F.R. 35.134;

100.    Failing to mitigate the harm that continues through present.

101.    As a result of Defendants actions and inactions, Ms. Eisenlohr and her child
S.D.E. are persons aggrieved who have been injured and suffered pecuniary losses,
emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life,
and other nonpecuniary losses.

102.    A Judge is not immune for tortious acts committed in a purely Administrative,
non-judicial capacity. Forrester v. White, 484 U.S. at 227-229, 108 S.Ct. at 544-545;
Stump v. Sparkman, 435 U.S. at 380, 98 S.Ct. at 1106. Mireles v. Waco, 112 S.Ct.
286 at 288 (1991).

103.    A state forfeits its sovereign immunity upon accepting the funding under section
504 of the Rehabilitation Act of 1973. Any immunity is abrogated.

104.    The Defendants in this section have not done self-evaluations of their agencies,
policies interagency agreements, etc. per § 35.105 Self-evaluation.

105.    Title II defendants are entities that have not completed self-evaluations for any of
the program, policies, interagency agreements that the plaintiffs were forced to use.

If such evaluations took place, harm could have been mitigated. per § 35.105 Self-evaluation. Part (d) of this section is important because most entities purport that they did self-evaluations in 1993. However, the law changed twice, and evaluations that take in consideration these changes show a good faith effort on the entity's behalf. This is not the case here. (d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluation.

106.    Covered entities may not "utilize criteria or methods of administration "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability [or t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii); see also 45 C.F.R. § 84.4(b)(4)(i), (ii). The preamble to the 1991 Title II regulation explains that the criteria and methods of administration are the policies and practices of the public entity. 28 C.F.R. pt. 35, App. B (discussing 28 C.F.R. § 35.130(b)(3)).

107.    A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities only if those safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. § 5.130(h).  prohibits the public entity, in the selection of procurement contractors, from using criteria that subject qualified individuals with disabilities to discrimination on the basis of disability. In addition, the

public entity may not establish requirements for the programs or activities of
licensees or certified entities that subject qualified individuals with disabilities to
discrimination on the basis of disability. It provides that the public entity must
administer services, programs, and activities in the most integrated setting
appropriate to the needs of qualified individuals with disabilities, i.e., in a setting that
enables individuals with disabilities to interact with nondisabled persons to the fullest
extent possible, and that, persons with disabilities must be provided the option of
declining accommodations.

108.    The Defendants, The -------et al, have not done required self-
evaluations per 35.105 Self-evaluation to be compliant with 2009 and 2016 changes
Americans with Disabilities Act. Section 35.105 establishes a requirement, based on
the section 504 regulations for federally assisted and federally conducted programs,
that a public entity evaluate its current policies and practices to identify and correct
any that are not consistent with the requirements of this part. Per ADA/ADAAA, and
Final Rule 2016. The defendants The State of Connecticut et al have no place in
such exemption from self-evaluations. "Experience has demonstrated the self-
evaluation process to be a valuable means of establishing a working relationship
with individuals with disabilities, which has promoted both effective and efficient
implementation of section 504. The Department expects that it will likewise be useful
to public entities newly covered by the ADA." The Defendants have done no such
evaluations for the following entities the plaintiffs were forced to use and expressly

109.    Guardians Ad Litem under the Office of the Child Advocate, formerly known as
the Office of Child Protection, Guardian a Litem up to 2012 Guardians ad litem who

were not on the list of the Office of Child Protections, usually AFCC CTAFCC

members, no oversight and no accountability.

110.    Guardians ad Litem, Law guardians, under whatever similar title they may be

call, add lawyers for children Defenders' Office 2012 –present and Guardians ad

litem who do not answer to any office and are appointed at ten times the rate the

state found the service to be worth. Such title III and title II entities that routinely

mock, insult, scream, call names and use children to coerce favorable financial

outcomes for themselves.

111.    Court Support Services, Family Relations, Family Services, Guardian ad litems,

Child Support Magistrates/collections services and related divisions for child support

dollars, AFCC, and CTAFCC in 2006 (including trainings or programs trainings of

and/or for)-No self-evaluation has been done. The programing is non-compliant with

The Americans With Disabilities As Amended Act

112.    No self-evaluations have taken place for the Judicial Review Counsel, or

routinely dismisses ADA/ADAAA violations, regarding people who submit,

"disgruntled. People whose assets, homes and children that have been stripped of

them for unjust enrichment are not disgruntled, they are victims.

113.     No self-evaluations have ever been done to the State Connecticut Judicial

Branch Training material;

114.    No self-evaluations have been done by the office of the public defender.

115.    No self-evaluations have been done for the plaintiffs on any level or by agency,

evaluators, guardian ad litem, or any services court ordered and nowhere in the

2008-present, nothing remotely close to the ADA/ADAAA.

116.    No self-evaluations have been done on the states inclusiveness of the disabled to take part in legislature.

117.    No Self evaluations were made by the Family Commission.

118.    No self-evaluation exists or the entities the plaintiffs were forced to use, the extensive harms on the Plaintiffs are compounded further by the lack of accountability and accessibility to those self-evaluations documents which further hindered, deterred, delayed, created lost time, and/or destroyed valuable evidence checkpoints in this case (as well as for related cases intertwined or those spurred from) including that; The Connecticut et al is obligated by law to perform such self-evaluations, to retain those documents, utilize, and/or search for these mandated a self-evaluations part of the interwoven processes and/or as part of their employment practice/expectations as well as for their responsibilities to follow up on or for immediately reporting any missing self-evaluations, unlawful deviation from or any by pass from the expected mandate to actually do the self-evaluations, provide and/or retain them as mandated - anything less than those mandated steps along those checkpoint layers is blatant participatory violation action/inaction and/or is continuing harm caused by the defendants onto the plaintiffs as well as the same harm caused by the defendants on all those in Connecticut similarly situated with sex and/or ADA/ADAA discrimination; and as well as the same harm caused by the defendants on all others similarly situated.

119.    Collectively with all issues cited here within are compounded by the lack of accessibility to these Self- Evaluations documents which further hindered, deterred, delayed, created lost time, and/or destroyed valuable evidence checkpoints in this

case (as well as for related cases intertwined or those spurred from including that;

120.    The defendants are by law to perform, such evaluations, to retain those documents, utilize, and/or search for these mandated Self- Evaluations as part of the interwoven processes and/or as part of their employment practice/expectations as well as for their responsibilities to follow up on or for immediately reporting any missing Self- Evaluations, unlawful deviation from or any by pass from the expected mandate to actually do the Self- Evaluations, provide and/or retain them as mandated - anything less than those mandated steps along those checkpoint layers is blatant participatory violation action/inaction and/or is continuing harm caused by the defendants onto the plaintiffs as well as the same harm caused by the defendants on all those in Connecticut similarly situated with sex and/or ADA/ADAA discrimination; and as well as the same harm caused by the defendants on all others similarly situated.

121.    No self-evaluations on remedies (lack of) to harm caused to discriminations made aware to the Judicial Branch's administrative offices.

122.    The State of Connecticut has not made its interagency agreements compliant to the ADA/ADAAA, of the many most namely the Fatherhood initiative grants and disbursals of Fatherhood Initiative, Responsible Fatherhood and Healthy Marriage Promotion. Collectively the State of Connecticut Child protection agencies have done no such evaluations required by CFR › Title 28 › Chapter I › Part 35 › Subpart A › Section 35.105 subpart (d) is especially important as all the programs plaintiffs were subjected to or tried to use do not comply with the Americans With Disabilities Act as Amended.

123.    28 CFR 35.105 - Self-evaluation. CFR Authorities (U.S. Code) § 35.105 Self-evaluation.

124.    (a) A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

125.    (b) A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments

126.    (c) A public entity that employs 50 or more persons shall, for at least three years following completion of the self-evaluation, maintain on file and make available for public inspection:

    (1) A list of the interested persons consulted;

    (2) A description of areas examined and any problems identified; and

    (3) A description of any modifications made.

    (d) If a public entity has already complied with the self-evaluation requirement of a regulation implementing section 504 of the Rehabilitation Act of 1973, then the requirements of this section shall apply only to those policies and practices that were not included in the previous self-evaluations

127. Association of Family and Conciliatory Courts and Connecticut chapter of AFCC implements, provides training, sells programming that violates Titles II

and III of The Americans with Disabilities Act. The Title II and III entities that utilize programming are Judge and lawyers who possess a law degree, a bar exam success and use of the title II facility of Court that demonstrates their legal acumen. The Title II entities also have and EEOC that AFCC programming contravenes law. Title III of the ADA, 42 U.S.C. § 12182, provides that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." Since AFCC members are directly involved in a title II capacity, it is the AFCC that creates programming that contravenes the ADA/ADAAA and 504

128. Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(ii), provides that: "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." Association of Family and Conciliatory Courts and Connecticut chapter of AFCC implements, provides training, sells programming that violates title III of The Americans with Disabilities Act. The Title II and III entities that utilize programming are Judge and lawyers who possess a law degree, a bar exam success and use of the title II facility of Court that demonstrates their legal acumen. The Title II entities also have and EEOC that

AFCC programming contravenes. These legal professional are responsible to follow state and federal laws.

## COUNT II

## SECTION 504 OF THE REHABILITATION ACT

127.    Paragraphs 1 through 134 above are re-alleged and reasserted as if fully set forth here.

128.    Ms. Eisenlohr is an individual with; anxiety, stresses, traumas akin to PTSD and regarded by Defendants as an individual having being in need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-centered, stressed, emotionally negligent, causing ex-spouse to act out in violent behavior including not properly responding "in the Spirit of" the court orders.  She required appropriate individualized treatment, accommodations, and full and equal access to court proceedings concerning her parental rights and the custody of her minor child S.D.E. accordingly, she is a qualified individual with a disability.

129.    S.D.E. is a minor child regarded by Defendants as individuals having been alienated with "PAS", anxiety, Black and White thinking. She required appropriate individualized treatment, accommodations, and full and equal access to court

proceedings concerning her custody and their mother's parental rights; accordingly, S.D.E. a qualified individual with a disability.

130.    Defendants are recipients of federal financial assistance.

131.    The Healthy Marriage and Responsible Fatherhood (HMRF) initiative is a $150 million discretionary grant program originally authorized under the Deficit Reduction Act of 2005 and reauthorized under the Claims Resolution Act of 2010.

132.    The State of Connecticut, et al, have a policy and *modus operandi* of discriminating against mothers, particularly single mothers and victims of domestic violence, in order to receive federal grants via The Healthy Marriage and Responsible Fatherhood (HMRF) initiative.  Defendants pit Responsible Fatherhood against the Violence Against Women Act (VAWA) to generate a cyclical need for funding.

133.    See Quillion v Wollcot US 1978, when a dissolution is granted the state creates two new families and the "best interest is interest standard is unconstitutional for the state to disturb the families it created. Only by child protective services can the state intercede in families.

134.    Defendants have a pattern and practice of using mental health accusations and discriminatory policies, namely alienation, parental alienation including using platforms created to accuse alienation and push being in need of psycho-social intervention Cognitive-behavioral therapy (CBT) for such as having a mental impairment in part as being snug, manipulative, causing parental alienation, making mountains out of mole hill, relying on maternal instinct, being bizarre, selfish, self-

centered, stressed, emotionally negligent, causing ex-spouse to act out in violent

behavior including not properly responding "in the Spirit of" the court orders against

mothers and children to achieve the goal of getting federal funding via HMRF.

135.    Defendants here used Ms. Eisenlohr's family to obtain federal "access" grants via

Fatherhood funding to further discriminate against Ms. Eisenlohr and her child

S.D.E..  Defendants gave Ms. Eisenlohr's former husband more access to the child

S.D.E. to the extent where Ms. Eisenlohr's access to the child S.D.E. was

completely taken away based on her disabilities and sex-based stereotypes of those

disabilities.

136.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified

individual with a disability, solely by the reason of his or her disability, may "be

excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance."

137.    Defendants have discriminated intentionally against Plaintiffs by refusing

appropriate individualized treatment and accommodations necessary to ensure full

and equal opportunity for Plaintiffs to participate in Defendants' programs in violation

of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

138.    As a result of Defendants' actions and inactions, Ms. Eisenlohr and her child

S.D.E. are persons aggrieved who have been injured and suffered pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life,

and other nonpecuniary losses.

139.    Picking v. Pennsylvania R. Co. 151 Fed. 2nd 240; Pucket v. Cox 456 2nd 233

Pro se pleadings are to be considered without regard to technicality; pro se litigants pleadings are not to be held to the same high standards of perfection as lawyers. Plaintiffs require the accommodation or reasonable modification of counsel. Please see motion for counsel.

### Prayer for Relief

WHEREFORE, Plaintiffs demand judgment against Defendants for the following:

140.    Declare that Defendants have violated Title II of the ADA, 42 U.S.C. §12131 *et seq.*, and its implementing regulation, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. §12181 *et seq.*, and its implementing regulation, 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

141.    Enjoin Defendants, their officers, agents and employees, and all other persons in active concert or participation with Defendants, as well as any successors or assigns, from engaging in discriminatory policies and practices against individuals based on their disabilities, and specifically from failing or refusing to take appropriate steps to ensure compliance with the requirements of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, and its implementing regulations, 28 C.F.R. Part 36, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

142.    Order Defendants to modify their policies, practices, and procedures as necessary to bring them into compliance with Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35; Title III of the

ADA, 42 U.S.C. § 12181 *et seq.*, and its implementing regulations, 28 C.F.R. Part

36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

143.    Order the Defendants, their agents and successors in office, and all persons

acting in concert with the Defendants to promptly remedy the demonstrated

violations of Title II of the ADA and its implementing regulation, and mitigate harm to

Plaintiffs;

144.    Terminate Defendants' federal financial assistance;

145.    Assess a civil penalty against defendants as authorized by 42 U.S.C. §

12188(b)(2)(C) to vindicate the public interest;

146.    To reimburse Ms. Eisenlohr for the expenses she incurred with post judgment

litigation in the amount of $80,000.00

147.    To award compensatory and punitive and damages to Plaintiffs; Three million

dollars ($3,000,000.00) to each plaintiff from each the State of Connecticut Et al and

its direct title II actors

148.    Award from each defendant $10,000.00 to each plaintiff

149.    Award from each defendant (Gionocchio, Danaher, Grundel, Beach, Mezza

Menchetti, Menchetti At Law, Camp, Frigon,  Porzio, Porzio Law, Gaston Law,

Gaston/Estate of Gaston) to each plaintiff: $850,000.00 (which equates  to

$10,000.00 per month for 85 months November 2010 – December 2017)

150.    Award from each defendant in title II and title III capacity, $10,000.00 to each

plaintiff

151.    To award Plaintiffs' attorney's fees and costs;

152.    Injunctive relief: Plaintiffs ask the court to honor the divorce settlement

agreement contract dated March 15, 2005 and further the Plaintiffs want divorce

settlement agreement contract dated March 15, 2005 in CASE NO. LLI-FA03-

0091072 S SCOTT W. EISENLOHR v. PAMELA EISENLOHR enforced.

153.    Declaratory relief:  As void orders can be challenged in any court as the Plaintiffs

do in this case; Plaintiffs ask the court to declare that all orders made from March

16, 2005 AFTER divorce to date in CASE NO. LLI-FA03-0091072 S SCOTT W.

EISENLOHR v. PAMELA EISENLOHR are declared void and they are legal nullities

154.    Any and All award compensatory and punitive and damages to Plaintiffs and

reimbursements dollars are to be paid directly to Plaintiff Ms. Eisenlohr who will

maintain such tax free dollars for the sole benefit of the Plaintiffs inclusive of Plaintiff

Mother Pamela Dudgeon Eisenlohr (Pamela Eisenlohr) portions and her minor

daughter Plaintiff S.D.E.'s portions to be placed in trust by her Mother, Pamela

Eisenlohr; and such portions will be at Pamela Eisenlohr's sole possession of, sole

maintenance of, and sole discretion of for Plaintiffs benefit.

155.    Order Defendant Mezza Menchetti to immediately remove all liens she has

placed on Plaintiffs Pamela Eisenlohr's property

156.    Order such other appropriate relief as the interests of justice require.

Signed: _Pamela Dudgeon Eisenlohr_    21 Dec 2017

        Pamela D. Eisenlohr in propria persona,
        and a/n/f of S.D.E.
        on behalf of all others similarly situated

2 Winchester Avenue
Winsted, CT  06098
Tel:  860-208-8523
Email:  sezco@aol.com


## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the Plaintiff in the above

action, that she has read the above averments, and that the information contained

herein is true and correct to the best of her knowledge.

Respectfully submitted, December 21, 2017

Pamela Dudgeon Eisenlohr, in propria persona,
and a/n/f of(S.D.E.), and
on behalf of all others similarly situated
2 Winchester Avenue
Winsted, Connecticut  06098


The Plaintiff

Pamela Dudgeon Eisenlohr in propria persona,
and a/n/f of S.D.E.
on behalf of all others similarly situated
2 Winchester Avenue
Winsted, CT  06098
Tel:  860-208-8523
Email:  sezco@aol.com


## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the plaintiff in the above

action, that she has read the above complaint, and that the information contained

therein is true and correct.

Signed: _Pamela Dudgeon Eisenlohr_    21 Dec 2017

      Pamela Dudgeon Eisenlohr in propria persona,
      and a/n/f of S.D.E.
      on behalf of all others similarly situated
      2 Winchester Avenue
      Winsted, CT  06098
      Tel:  860-208-8523
      Email:  sezco@aol.com

Granted/denied  Judge_____